FISHER ELECTRIC CO. *v.* BATH IRON WORKS.

1. CONTRACTS—GOVERNMENT WORK—FAILURE TO PROVIDE SPECIFICATIONS—LIABILITY TO SUBCONTRACTOR.

One engaged in building a gunboat for the government under contract is liable to his subcontractor, who has agreed to equip the boat with electric lights, for damages resulting from delay in furnishing drawings, specifications, and other information mentioned in the contract, although the delay was caused by the government inspector's failure to provide them.

2. SAME—CONSTRUCTION.

A subdivision of a contract to install a boat with electric lights was designated as "plant." The first sentence defined the plant as consisting of two engines and two dynamos, and the other provisions in the subdivision referred to the plant in language consistent with such definition. *Held*, that it had such meaning wherever found in the subdivision, though ordinarily it has a broader meaning, and other subdivisions of the contract used it in the latter sense.

3. SAME—PUBLIC POLICY.

In a suit by an electric company upon a subcontract to install a government gunboat with electric lights, plaintiff sought to recover at the rate of $90 per week for extra labor, the actual cost of which to it was only $26.50 per week, claiming that the former amount was agreed upon because of an understanding with the contractor that the government would be "soaked" for extras. *Held*, that the agreement was against public policy, and void, and that plaintiff could recover only what the services were reasonably worth.

4. SAME—SERVICES NOT CONTEMPLATED—COMPENSATION.

By the terms of the subcontract, plaintiff agreed to furnish search-lights at a stated price, defendant agreeing to pay all of the cost in excess of that sum. Defendant wrote urging plaintiff to purchase a certain expensive light, and affirming its liability for the excess. Plaintiff's president, in order to arrange the purchase, made several trips to a distant city, but kept no account of his expenses, and rendered no bill therefor at the time. *Held*, that a charge for such services and expenses should be disallowed, as not within the contemplation of the parties.

5. SAME—PAYMENT OF EXCESSIVE SUM—DURESS.

A payment made by a contractor to a subcontractor of an excessive charge for labor in order to secure the shipment of materials which he needs, and which the subcontractor has agreed to furnish, is not a ratification of the correctness of the bill, and will not preclude an adjustment of the items upon final settlement.

Error to Wayne; Lillibridge, J.    Submitted February 2, 1898.    Decided March 15, 1898.

*Assumpsit* by the Fisher Electric Company against the Bath Iron Works, Limited, to recover a balance due for materials and labor. From a judgment for plaintiff, defendant brings error.    Reversed.

Defendant, a corporation of Bath, Me., was, in 1891, constructing two gunboats for the United States. September 9, 1891, it made a contract with plaintiff to install said boats with electric lights. The contract was based

upon specifications issued by the naval department of the United States to defendant, and furnished by it to plaintiff as the basis for its bid. The contract is evidenced by a written proposition by plaintiff to defendant, and accepted by it. The specifications were attached to the proposition, and are made a part of the contract. They are divided into various subdivisions, such as "plant," "engines," "dynamos," etc. The parts of the specifications essential to an understanding of the points raised are as follows:

"Plant: The plant shall consist of two engines and two dynamos, both to be economical, efficient, and of an approved pattern. Each engine and its corresponding dynamo must be secured to the same bedplate. The latter shall be as light as practicable, and catching all waste oil. The plant must operate at all times practically without noise, and be capable of running continuously with full load without undue heating of bearings. All working parts of the plant must be accessible for examination and repair; and generally it must be the most compact, the lightest, and best adapted for marine work, particularly when at sea, of any that can be obtained at the time it is placed in the ship. It will be located as shown on the plans, and protected from the access of moisture, dust, and dirt. The general dimensions of all parts of the plant must correspond to the place assigned it, leaving ample space for the care, repair, and dismounting of the same. The dynamo room must be amply ventilated, either on the force-in or on the exhaust system, at will, by means of a fan driven by an electric motor, with two pipes independent of all others, one for exhaust and one for the supply of air. Suitable arrangements must be made so that either dynamo may be connected with any or all of the incandescent or arc light circuits. The plant must be fully completed in every respect, ready for service, and supplied with all appurtenances and appliances necessary for its care, manipulation, and repair, among which may be mentioned two volt and two ampere meters, one apparatus for measuring insulation resistance, one testing generator, one hand tachometer, tools, wrenches, oil-cups, oil-cans, feeders and tray, oil-tank with filter attached, brush-jigs, drip-pans and piping, guards, and hand-rails; all of an approved pattern. Every article of

the installation must be weighed in the presence of the inspector. The engines, dynamos, and bedplates complete must not exceed 6,000 pounds in weight."

This specification was changed by plaintiff's proposition in the following language:

"Plant: Clause No. 1. Strike out the words 'with suitable provision for securing a tachometer.' You are to furnish necessary system of piping for ventilating fan. Strike out the words 'two belted tachometers.'"

Under title "Search-Lights" is the clause:

"All switches, resistance coils, and other appurtenances necessary to connect the projector to the dynamos must be supplied and installed to the satisfaction of the inspector."

"Spare Parts: Such spare parts of the engines, dynamos, and all other portions of the plant shall be provided as will enable it to be used for a period of three years without additions. All spare parts must be tried in place, and must be to the satisfaction of the inspector in regard to amount, though based upon the supposition that the plant shall receive good and intelligent care; one dynamo always to be in operation; that the lifetime of the lamps is 600 hours, and that each lamp is in use three hours daily."

"General Information: A set of drawings of engines and dynamos on tracing cloth must be supplied. Such other information about the plant as may be required by the inspector shall also be supplied. When the construction of the ship has sufficiently progressed, the inspector shall supply a detailed list of the number of lamps, their candle-power and general location, number of sections, and candle-power on each section, various kinds of fixtures, and the number of each, number of switches, junction-boxes, receptacles, spare parts, and all other details necessary and reasonable, in order that the work of installation may be intelligently laid out and the proper materials and supplies ordered."

"Inspection and Acceptance: The work of installing the ship shall be subject to the supervision of an inspector representing the Bureau of Equipment, Navy Department."

To the specification as to engines was added this clause:

"The engines are to be of the type illustrated in blue prints submitted for examination, and we agree to make any detailed alterations or changes the inspector may require."

It was also agreed that plaintiff should, within two months, submit, for the purpose of test by the resident government inspector, one complete engine, dynamo, and switchboard, and that "supplies, appliances, or anything not mentioned in the specifications that may be required shall be paid for as extras."

The contract was performed by plaintiff, after which it brought this suit, claiming that defendant was liable for extra material furnished and labor performed, and for damages suffered through the failure of defendant to furnish seasonably drawings, specifications, and other information, required by the contract to be furnished by defendant, and essential to the plaintiff for the prompt performance of the work. A counter charge of delay on the part of plaintiff is made by defendant, but no damages are claimed in consequence thereof. The contract price was $17,300. The total claim of plaintiff is $29,148.03. The total payments made by defendant are $23,100. The verdict was $5,356.20.

*Rowland M. Connor* (*John D. Conely*, of counsel), for appellant.

*Wells, Angell, Boynton & McMillan*, for appellee.

GRANT, C. J. (*after stating the facts*). 1. Assuming that there was delay on the part of the inspector to furnish to plaintiff the drawings, specifications, and other information mentioned in the contract, is the defendant liable for such default? It is urged by counsel for the defendant that plaintiff accepted all the chances of delay on the part of the inspector, and thereby relieved it from any duty in regard to this information. There was no contractual relation between plaintiff and the government. The contract for the construction of the boats was be-

tween defendant and the government. Defendant had agreed with the government to furnish these boats with electric light plants. Whether defendant installed them itself or let the contract was immaterial to the government. The agreement to furnish these drawings, etc., was made with the defendant, and the plaintiff could look to it, and no one else, for the failure to furnish them. The original specifications were furnished to plaintiff, and formed the basis of the contract. The inspector represented the defendant, not the plaintiff. The court was therefore correct in holding the defendant liable for any damages which resulted from delay in furnishing the drawings, etc.

2. During the period from the date of the contract, in 1891, to its completion, in 1893, various improvements had been made in electrical apparatus, and plaintiff furnished some more expensive articles than those commonly known and in use at the time the contract was made. The court instructed the jury that the contract was made with reference to fixtures and appliances best known and in common use at the time the contract was made, and that, if plaintiff was required to and did furnish more expensive articles than those which were in common use at that date, it was entitled to recover for them. The correctness of this instruction depends upon the construction to be given to the term "plant," used in the specifications under the title "Plant." Houston's Electrical Dictionary defines the term as follows:

"Plant—a word sometimes used for installation, or for the apparatus required to carry on any manufacturing operation. An electric plant includes the steam engines or other prime motors, the generating dynamo or dynamos, the lamps and other electro-receptive devices, and the circuits connected therewith."

It is insisted that the term in this contract means a plant as above defined. Defendant's position is based upon that clause of the contract which says:

"All working parts of the plant  *  *  *  must be the most compact, the lightest, and best adapted for marine work, particularly when at sea, of any that can be obtained at the time it is placed in the ship."

It is insisted that this clause includes everything in every part of the boats which is covered by the numerous specifications. But, clearly, this language is restricted to the plant as defined in the subdivision in which it is used. The parties have there seen fit to define the plant to which this language applies, and have confined it to two engines and two dynamos. All the language of this subdivision is peculiarly appropriate to the plant as described in the first sentence. The mere fact that the term "plant" is used in its broader sense in other subdivisions of the specifications does not affect the construction of the term as restricted by the subdivision in question. The court was therefore correct in holding that the plant meant the engines and dynamos.

3. All labor charges for overtime were made by the plaintiff at $1.50 per hour, or $15 a day. For most of this work plaintiff actually paid $26.50 a week. Upon this point Mr. Fisher testified as follows:

"The labor charge was agreed upon by Mr. Hanscom and myself at $1.50 per hour. I had the conversation fixing the charge for labor at $1.50 per hour with Mr. Hanscom, the superintendent of the defendant company, in December, 1891.

"Q. What was that conversation?

"A. The conversation was with reference to the extras, and Mr. Hanscom said: 'Of course, we expect to make a good deal of money out of this extra work. The government expects to be soaked on it, and we will help you get all you can for it—for anything extra.

"Q. What was said about the price?

"A. I think that I told him at that time that we should charge on all labor at the rate of $15 a day for extra work.

"Q. And this deal was made in accordance with this arrangement?

"A. Yes, sir."

On cross-examination he testified:

"*Q.* You had a positive agreement with Hanscom to allow you $15 a day?

"*A.* Yes, sir.

"*Q.* That was upon the understanding that the government would be soaked?

"*A.* Yes, sir."

The circuit judge instructed the jury that, if the parties entered into an agreement to charge an excessive price to the government, or "soak" it, such an agreement was against public policy, and void; and added:

"But, if you believe that the agreement between Fisher and Hanscom was, as counsel for the plaintiff claims, that the United States government expected to be 'soaked' in the matter, and that the agreement was that the Bath Iron Works would allow $1.50 an hour, if that agreement was made, then it is binding; and if you believe from the testimony that such an agreement was made between Hanscom and Fisher, that settles the question of extra labor, and you must allow $1.50 an hour."

The charge is grossly excessive. Under the instructions, plaintiff was permitted to recover about four times what the actual damages were. As an illustration, one Moag, plaintiff's employé, who was paid $26.50 per week, was engaged on board the boats in putting in the plant. Under the contract, defendant was to drill holes through the framework of the boats for the insertion of wires, etc. Moag testified that during the absence at various times of one Swanton, who superintended this work for the defendant, he directed the drillers, and estimated his time at 600 hours, and plaintiff charged for it $900. He " kept no track of his time, because he didn't think he had to." In the absence of a special agreement, plaintiff could only recover what such services were reasonably worth. The agreement is positively denied by defendant, and when the bill was rendered it made an emphatic protest. The contract, therefore, rests entirely upon the testimony of Mr. Fisher. The sole ground he urges to sustain such a grossly-excessive charge is that it was made "upon the understanding that the government would be soaked."

All such contracts, whether based upon an express agreement or simply an understanding, are against public policy, and void. The law does not permit the accomplishment of such an illegal purpose under the guise of an "understanding." This contract, based upon any view of Mr. Fisher's version of it, is void. The court should have so instructed the jury, and further should have instructed them that plaintiff could recover only what such servcies were reasonably worth.

4. By the terms of the contract, plaintiff agreed to furnish search-lights for $800. The contract contained this clause:

"If the department insist upon imported lamps, or we are unable to satisfy them with lamps of American manufacture which shall not exceed $800 in price, you are to pay the additional net cost."

On January 15, 1892, defendant wrote plaintiff:

"We believe that, if an approved type of search-light can be bought outright for a reasonable price, much delay will be saved, and should like to get the price of the 18-inch light before doing more about it."

In reply to this, January 21st, plaintiff wrote:

"Noting your remarks of January 15th, the search-light outfits will cost, according to quotations made us by the Thomson-Houston Electric Co., $1,715 each, and we, ourselves, consider delay would be avoided if they are purchased outright. Under the contract, you are to pay all in excess of $800. We think the search-lights can be duplicated for not more than $1,200. If you wish to authorize the additional expense, kindly do so in writing, and we will place the order for them, that delivery may not be delayed."

To this defendant replied, January 26th:

"The matter of obtaining search-light has been referred by me at length to Mr. Hanscom and Gen. Hyde. Their decision is that it is desirable to obtain all our apparatus as soon as possible, and do everything to forward the work, and I am authorized to say that, if two search-light outfits, guaranteed to pass government inspection,

can be bought for approximately $1,715 each, the Bath Iron Works will pay the excess in cost over $800 each, or about nine hundred and fifteen dollars ($915) each."

Plaintiff purchased the search-lights, and rendered a bill of $3,430. Mr. Fisher obtained a reduction of $430. After obtaining the reduction, plaintiff did not credit defendant with the $430, and was permitted to recover it in this case upon the ground that he had made two trips to New York to purchase the lights, and that this was a proper charge for his services and expenses. Fisher made no charge for this upon plaintiff's books, kept no account of his expenses, and rendered no bill for it at the time. His testimony is very indefinite. He says he made two or three trips to New York, was gone four or five days each trip, and probably allowed himself $20 per day. No such charge was contemplated by the contract, or agreed upon, and the court should have directed its disallowance.

5. On October 20, 1893, plaintiff wrote defendant as follows:

"Inclosed please find bills for 'placing the switchboard on the Machias,' repairing switchboard for 'Castine,' and 'testing circuits.' The switchboard and armatures will be sent forward when you deposit with the agent of the United States Express Co. at Bath the sum of bills rendered to date ($1,943.80)."

Bills covering this amount, it appears, had previously been rendered, and in reply to them, on September 30, 1893, defendant wrote to plaintiff:

"I have answered your telegram as follows: 'Have not sent check. Bills excessive.' You should be ashamed of sending out such prices. They are much more than double what the thing is worth. * * * You may as well understand first as last that we shall pay no such bills. How do you justify charging $1.50 per hour?"

In reply to the letter of October 20th, defendant wrote:

"We have today given the American Express Co. check for $1,944, and they have promised to wire their

people to send the switchboard and armature along. We do not feel satisfied with the bills, but have had no chance to write you about it before. Please explain on what grounds you charge $1.50 per hour for Moag and his helpers. Also would like to have you tell me if the other bills are based in a similar manner, because I have to put in a bill for fixing the armature to the government, and do not want to put in a bill they will refuse to pay. If you will assure me that the charge of the armature is a fair one, I can put in a bill. As far as the $15 a day is concerned, you know as well as we do that no jury will allow it, and we do not suppose for a moment that you intend to insist upon such a ridiculous charge."

It is manifest that plaintiff was endeavoring to force a payment. It was necessary for defendant to have the goods, which were placed in the express office at Detroit, immediately. Its own witness Moag so testified. Under these circumstances, payment by the defendant was not a ratification of the correctness of the bills, and upon final settlement the items of these bills were open for adjustment. The court should have so instructed the jury.

There are other small items to which defendant objects on the ground that there was no evidence to sustain them. We think there was a conflict of evidence upon them, and that they were properly submitted to the jury.

Judgment reversed, and new trial ordered, unless counsel can agree upon the amounts to be deducted from the verdict and judgment under this opinion, and have a judgment entered in this court, and thus end the controversy.

The other Justices concurred.