PEOPLE'S COUNSEL, PUBLIC SERVICE COM-
MISSION ET AL. *v.* PUBLIC SERVICE COM-
MISSION OF MARYLAND ET AL.

[No. 41, September Term, 1970.]

*Decided October 23, 1970.*

*Motion for clarification filed by Baltimore Gas and Electric Company on October 26, 1970; per curiam filed October 30, 1970.* (Per Curiam at p. 435 *infra.*)

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Peter Parker*, People's Counsel, Public Service Commission, part of appellants, and *John M. Court, Assistant County Solicitor for Anne Arundel County*, with whom were *Phillip F. Scheibe, County Solicitor for Anne Arundel County*, (*Paul F. Borden, County Solicitor*, on the reply brief), *Michael R. Roblyer, Assistant County Solicitor for Anne Arundel County*, on the brief *for Anne Arundel County*, another appellant, and *James C. Cawood, Jr.*, on the brief for Chesapeake Environmental Protection Association, Inc. and Frank R. and Calpurnia S. Carter, other appellants.

*Charles R. Richey*, General Counsel, Public Service Commission, for appellee Public Service Commission of Maryland.

*James W. Biddison, Jr.*, with whom were *W. Robert Buchanan* and *Paul W. Davis* on the brief, for appellee Baltimore Gas and Electric Company.

HAMMOND, C. J., delivered the opinion of the Court. BARNES and McWILLIAMS, JJ., dissent. BARNES, J., filed a dissenting opinion, in which McWILLIAMS, J., concurred, at page 424 *infra.*

The Calvert Cliffs Nuclear Power Plant of Baltimore Gas and Electric Company (the Company) in Calvert County, Maryland, which recently has led to various differences of opinion, scientific and otherwise, is responsible for the question now before us for decision. The legislature of 1968 passed Ch. 493 of the Laws of that year, which is now codified as § 54A of Art. 78 of the Code. The statute became effective July 1, 1968, to provide in pertinent part that:

> "No electric company may begin the construction in Maryland of a generating station or any overhead transmission line designed to carry a voltage in excess of 69,000 volts, or exercise the right of eminent domain in connection therewith, without having first obtained from the [Public Service] Commission a certificate of public convenience and necessity for the construction of the station or line."

The Commission is directed to hold a public hearing on a request for a certificate in the area involved, together with the local governing bodies of the area. Final action is to be taken by the Commission only after due consideration of the recommendations of the governing bodies, the present and future needs for service, "effect on system stability and reliability, economics, esthetics, historic sites, and, when applicable, the effect on air and water pollution."

It is agreed that the statute is prospective in operation, *Amereihn v. Kotras,* 194 Md. 591, 601, and the question presented is whether the Company began construction of the generating station prior to July 1, 1968. After a hearing necessitated by a petition filed with it by the People's Counsel asking the Commission to require the

Company to apply for the certificate required by § 54A, the Commission decided that construction had begun before July 1, 1968, and therefore the Company did not need a certificate in order to complete the generating station at Calvert Cliffs. In the appeal to the Circuit Court for Anne Arundel County Judge Melvin, using a test of judicial review of a Commission order established by Code (1969 Repl. Vol.), Art. 78, § 97, *Scope of Review*, held that whether construction had begun before July 1, 1968, within the meaning of § 54A, was a mixed question of law and fact and that "this court is unable to say that the Commission's decision * * * is 'unsupported by substantial evidence on the record considered as a whole.' "

The appellants, the People's Counsel, Anne Arundel County, individuals in the area involved, and the Chesapeake Environmental Protection Association, Inc. (its standing is not now challenged) contend that the question presented is solely one of law, rather than the mixed question of fact and law that Judge Melvin saw. The case was decided in the Circuit Court on the record before the Commission, and the evidence before the Commission was the testimony of an engineer of the Company and an employee of the supplier of the nuclear steam supply system and several exhibits, such as the Calvert County Code. There is no dispute as to the facts and we think that the question presented to us is, on the record before us, essentially one of law.

The Company produced testimony that (a) in December 1966 it agreed to buy from General Electric Company a $25,000,000 turbine generator (the testimony was that due to the long time required for manufacture and the "tremendous influx of orders to the turbine generator suppliers," it was necessary to have a "lead time" of some six years to assure delivery when needed) ; (b) in May 1967 it signed a memorandum of understanding with Combustion Engineering, Inc. for construction of the proposed plant's nuclear steam supply system (and thereafter made substantial progress payments from time to time) ; (c) about a week later the deed to the site was

delivered; (d) three days later the Company made a public announcement of its intent to construct a two-unit nuclear power plant at Calvert Cliffs; (e) immediately thereafter the Company caused to be drilled core borings in the earth of the proposed site to determine the composition and utility of the ground; (f) in June 1967 the Company ordered a second generator from Westinghouse Electric Company at a price of $25,000,000; (g) on July 31, 1967 the Company hired Bechtel Corporation (Bechtel) "to provide services for engineering and construction for the Calvert Cliffs nuclear power plant" (there is nothing in the record to show whether the hiring was in writing or oral, how definitive it was as to scope and time, or what specific services were covered); (h) in August 1967 certain seismological studies at the site were contracted for; (i) in December 1967 Bechtel prepared a bar chart showing excavation scheduled for June 1968, and in February 1968 a master flow chart that also estimated that excavation would begin in June 1968; (j) in January 1968 the Company sought and received from Calvert County a permit to "construct a metal shed" on land adjacent to the site (later also acquired by the Company) to use in testing condensor tubes; (k) later in January 1968 the Company filed with the Atomic Energy Commission (AEC) an application for a permit to construct the nuclear generating station (such a permit is required by the Atomic Energy Act of 1954, 42 U.S.C. § 2235, before construction of a nuclear facility can lawfully be begun;[1] (l) lumber companies cut marketable

---

1. The Company application for the permit shows the location of the plant on the site, capacity and physical size of the plant and required information as to the nuclear aspects of the plant, and, in the words of the Company's engineer-witness, the application was "another way of indicating that the plant design had progressed to the point where we could then begin to clear the ground and begin to go into actual physical work on the site." In answer to a question whether the AEC "only views the construction of the plant from the standpoint of nuclear pollution," the witness replied:

"That is not wholly correct * * *. More nearly, I think, would be [that] they examine all the structures in the plant, together with all the equipment, from many aspects, not only nuclear; but the plant has to be designed in ac-

timber in February 1968; (m) in April 1968 C. J. Lang-enfelder & Sons, Inc. (Langenfelder) began clearing and grubbing operations; (n) on June 6, 1968 Langenfelder, pursuant to oral directions from Bechtel, confirmed by letter and later by a written contract to do grading and excavation, began to move earth in order to level the site to an elevation of Plus 1. From June 6 to June 30 Lang-enfelder moved 104,000 cubic yards of earth, the first of the same kind of an ultimate total of 1,850,000 cubic yards, labelled as "unclassified excavation" in both the contract between Bechtel (acting for the Company) and Langenfelder, and in Langenfelder's invoice to the Company. The Company's engineer described "unclassified excavation" in contrast to "structural excavation" (both being called for by the contract, as were other categories such as "compacted fill") as "the more easily removed material," calling for a lower price than "structural ex-cavation" which was to be "the very deep, hard to re-move material," calling for a higher price.

The record shows that the following events took place after July 1, 1968. (1) The Commission's regulations effective both prior to and after July 1, 1968, required that major construction projects of a utility be reported to the Commission within one month following the be-ginning of such construction. On July 17, 1968 the Com-pany submitted a report showing that the construction period for the Calvert Cliffs plant would be from June 1968 to December 1974. (2) On April 17, 1970 the Com-mission granted the Company a certificate of Public Con-venience and Necessity for the transmission lines from the plant. (3) The Calvert County Building Code requires, subject to penalty for non-compliance, all persons "be-fore erecting or constructing any building in Calvert County" to apply for a building permit. The application must set forth in detail the location of the site, the size,

cordance with their requisites to withstand earthquakes, to withstand tornadoes, to withstand hurricanes, to with-stand tidal waves, all of these physical things, in addition to nuclear aspects of the design and location."

type of material and estimated cost of the building. The Company sought and obtained from Calvert County in January 1969 a permit for a $20,000,000 two-unit electric generating plant.

The petition of the People's Counsel in this case was filed with the Commission in May of 1969. In the same month, AEC held a two-day hearing at Prince Frederick in Calvert County on the Company's application for a construction permit and several months later granted the Company a permit to construct a nuclear production facility.

The Commission found that:

> "the beginning of fabrication of the major component parts of the generating station and the excavation and other physical activity at the site, coupled with the preparation and development of complete plans and entering into a contract with the general contractor and a substantial amount of performance under that contract by the general contractor, constituted the beginning of construction prior to July 1, 1968, within the meaning of Section 54A of the Public Service Commission Law * * *."

It was these findings that Judge Melvin found to be supported by substantial evidence.

We find the Commission's findings to be clearly erroneous. Section 54A forbids "the construction in Maryland of a generating station" without a certificate. If it be assumed—and we do not suggest that the assumption is the fact—that the Company's contractual directions to suppliers to build generators to be used years later in a station later to be built is part of the beginning of construction of that then physically non-existent station, it is manifest that the construction of the generators was not to be done in Maryland.

The Commission's findings attribute controlling significance to the moving of earth and other physical activity at the site coupled with the drawing of plans and the

hiring of a general contractor. All of these things except "excavation," which we find to have been no more than levelling of the site, were entirely preliminary to the beginning of construction in Maryland of a generating station. They do show evidence of the Company's undeviating intent to begin and to complete the nuclear generating station on the chosen site—indeed that intent is conceded without reservation by the appellants—but in the determination of whether construction has begun, intent is but one of two tests and of itself is not sufficient. In *Rupp v. Earl H. Cline & Sons*, 230 Md. 573, 578 (1962), dealing with the meaning of the phrase "commencement of [a] building" under Code (1957), Art. 63, § 15 (which gives a mechanic's lien claimant priority over a mortgage recorded after the commencement of the building), the Court analyzed the analogous cases of *Brooks v. Lester*, 36 Md. 65 (1872), *Jean v. Wilson*, 38 Md. 288 (1873), and *Kelly v. Rosenstock*, 45 Md. 389 (1876), and found the law to be clear:

> "that before there can be the *commencement of a building* which would give a mechanic's lien claimant a preference over a recorded mortgage there must be (i) a manifest commencement of some work or labor on the ground which every one can readily see and recognize as the commencement of a building and (ii) the work done must have been begun with the intention and purpose then formed to continue the work until the completion of the building. If either of these elements is missing then there has been no 'commencement of the building' within the meaning of § 15 of Art. 63."

Consequently, we think construction of a generating station has not begun within the meaning of § 54A of Art. 78 without the requisite physical evidence of construction on the site at the critical date, despite the fullest evidence of intent to complete the proposed structure.

The making of plans and the entering into of contracts

is not enough. In *Mayor & C.C. of Balto. v. Shapiro,* 187 Md. 623 (1947), we remarked that the issuance of a use permit where the permittee has not begun work does not create a vested right or prevent revocation of the permit. In *Bogley v. Barber,* 194 Md. 632, 639 (1950) the owner had spent $248.50 on architect's fees and more money to demolish an old dwelling incident to site preparation. Judge Markell for the Court stated "it would be hard to say that mere expenditure for plans, without doing any work on the property itself [the proposed new structure], created a non-conforming use or any vested constitutional right * * *." In *Francis v. MacGill,* 196 Md. 77, 85 (1950), a permit was issued 21 days before the zoning law was changed to prohibit the proposed use. The owners had commenced site preparation and well drilling. The Court held that no rights had vested under the permit, quoting *Rice v. Van Vranken,* 225 App. Div. 179, 232 N.Y.S. 506, to the effect that " 'Adoption of zoning ordinance *ipso facto* revokes permit for construction of building violating zoning restrictions, where no construction has been begun.' "

*Anne Arundel County v. Snyder,* 186 Md. 342, 347 (1946), is similar. There a man had bought land, had plans prepared by an architect and spent thousands of dollars in grading and landscaping in preparation for the construction of a boatyard. On November 17 he applied for a permit. On November 8 new zoning regulations were adopted that made the proposed use a prohibited one. Judge Henderson for the Court said:

> "But it does not follow that the proposed business in the case at bar was established or existing. No permit was issued, and if it had been, it would have conferred no vested right, nor would it have created an estoppel * * *."

In *Ross v. Montgomery County,* 252 Md. 497 (1968), developers of a proposed high rise apartment bought land, caused plans costing $56,000 to be prepared, demolished three old houses on the site, caused to be made test bor-

ings and preliminary engineering studies, and completed a single excavation and the installation of a single footing. No more was done within the life of the building permit, which required actual construction to be begun under it within six months, and thereafter the zoning law was changed. It was held that no vested interest or estoppel had been created because construction had not begun.

There remains of the findings relied on by the Commission only the finding that there had been "a substantial amount of performance * * * by the general contractor." This can only mean "the excavation and other physical activity at the site," since there is no showing of other acts done or caused to be done by Bechtel prior to July 1, 1968. It is beyond question—and the Company makes no real contention to the contrary—that the cutting down of trees and the grubbing of the land does not amount to the beginning of construction. There is left the moving by earth pushing machines in order to level the site of some 104,000 cubic yards—5.6% of the 1,850,-000 cubic yards that the levelling eventually required. The record strongly suggests and the Company's witness indicates explicitly that the Company relies largely, if not really solely, on the earth moving in June 1968 to show that construction began that month. The Company's witness was asked why the Company had reported to the Commission in July 1968 that construction had begun the previous month and he said that:

> "It was our judgment that sufficient physical work had been done on the site that constituted construction * * * in our judgment the excavation of 104,000 cubic yards of dirt was sufficient evidence of physical work."

The Company seeks to meet the test of some authorities that excavating for a foundation is the beginning of construction by labelling the moving of 104,000 cubic yards of earth that was accomplished prior to July 1, 1968 "unclassified excavation" but there can be little if any doubt

from the pictures of the process and the result, and the other evidence in the record, that it was not foundation excavating, if it be assumed that such excavation would be enough. Bechtel's letter of June 10, 1968 to Langenfelder refers to and discusses "excavating * * * and the rough grading." Langenfelder's bill for $100,800 for the moving of 104,000 cubic yards of earth during the period ending June 30, 1968 at a unit price of $0.97 a yard has opposite the heading "contract number" the explanation "Calvert Cliffs Grading." Wallace McWilliams, Jr., an engineer who was manager of the Electric Engineering Department of the Company (Engineering), which also has an Electric Construction Department (Construction), was the Company's witness. He testified that Engineering controls the specifications and designs and that it gives these to Construction to cause the station to be built, and then supervises the construction to see that it is done according to plan. The testimony shows that Engineering and not Construction was the active agent of the Company and in charge of the project prior to July 1, 1968. McWilliams testified that the purpose of the "unclassified excavation" was "to remove the earth necessary to establish the foundations for the plant." He said also that unclassified excavation covers dirt easily removed whereas structural excavation is "the very deep, hard to remove material * * * structural excavation * * * only applies to that material which is way down deep in the ground." Asked the question "prior to July 1, 1968, had any foundation been laid?" McWilliams responded: "None for the plant, no, sir." He was next asked "had there been the bringing together of any materials such as bricks or mortar or wood or other items on the site for construction?" and his answer was "No."

We find nothing in the legislative history of § 54A or in the subject matter with which it is concerned to show, or indeed to indicate, that the words "begin construction in Maryland of a generating station" were intended by the legislature to convey a meaning other than that they appear on their face to convey, and ordinarily would con-

vey. Chapter 493 of the Laws of 1968 that became § 54A of Art. 78 originated as Senate Bill 22, a Legislative Council bill, which was item 274 (1) of the Council's Report to the General Assembly of 1968, appearing at pp. 194-195 of the Report. The bill was inspired by the attempts of a utility to install power lines near or over the Antietam Battlefield.

As introduced, Senate Bill 22 merely added to the list of things a public service company could not do without prior approval of the Commission, the acquiring of any property or property interest by condemnation. The Bill was amended during its passage by the legislature to its present form.

42 U.S.C. §§ 2131 and 2235 require the obtaining from AEC of a construction permit before construction of a nuclear electric generating facility is begun. Regulations here pertinent, offered in evidence below, are found in 10 C.F.R. § 50.10 (b) and provide:

"No person shall begin the construction of a production or utilization facility on a site on which the facility is to be operated until a construction permit has been issued. As used in this paragraph, the term 'construction' shall be deemed to include pouring the foundation for, or the installation of, any portion of the permanent facility on the site; but does not include:

"(1) Site exploration, site excavation, preparation of the site for construction of the facility, including the driving of piles, and construction of roadways, railroad spurs, and transmission lines;

"(2) Procurement or manufacture of components of the facility;

"(3) Construction of non-nuclear facilities (such as turbo-generators and turbine buildings) and temporary buildings (such as construction equipment storage sheds) for use in connection with the construction of the facility; and

> "(4) With respect to production or utilization facilities, other than testing facilities, required to be licensed pursuant to section 104 a. or section 104 c. of the Act, the construction of buildings which will be used for activities other than operation of a facility and which may also be used to house a facility. (For example, the construction of a college laboratory building with space for installation of a training reactor is not affected by this paragraph.)"

The regulations as to nuclear generating stations, certainly the most sophisticated type of generating stations, seem to apply to nuclear generating stations the general rules as to what constitutes construction and the beginning of construction.

There being no evidence of legislative intent to the contrary, we must read the meaning of the words "begin construction in Maryland of a generating station" in § 54A as the same as the meaning the opinions and holdings in the Maryland permit-zoning cases cited earlier, involving the vesting of rights, gave the term "construction," and the same as the meaning the phrase "the commencement of the said building" in § 15 of Art. 63 (the Mechanic's Lien statute) has been given by the decisions of this Court. The Maryland cases have flatly held that grading the site does not constitute the commencement of the building that is to be erected on the site. *Rupp v. Earl H. Cline & Sons,* cited earlier, puts it thus at p. 579 of 230 Md.:

> "but even if it is assumed (for the purposes of this case) that there was no substantial change of plan and that the owner and builder had a continuing intention — if and when they could get financing and permission — to erect apartments of some type, we think it is apparent that the removal of soil from one part of the development to another even for the dual purpose of

grading one site to a specified level and filling in the other to the required height was at most a preparatory operation that was not the 'commencement of the building.' While the removal of soil had the effect of leveling the apartment site, that fact did not constitute *commencement* for the purpose of fixing the time to which a lien could relate. *Kelly v. Rosenstock, supra.* Nor did the grading or leveling — since there was no work on the ground which everyone could readily see and recognize as the commencement of a building, *Brooks v. Lester, supra*—have the effect of putting the party making the construction loan on notice that the building had been commenced, and we so hold.

"To hold otherwise would be contrary to the previous decisions of this Court. If any change in the meaning and effect of § 15 (of Art. 63) is either desirable or required that is a matter for the legislature, not the courts, to consider."

We think the legislature did not change the law as to when construction is begun when it enacted § 54A, but rather that it caused that law to be applied in a new specific area. The Maryland law is supported by two persuasive cases from other jurisdictions. In *McClung v. County of Henrico* (Va.), 108 S.E.2d 513, 516, McClung was arrested for commencing to build a veterinary hospital after his building permit had expired. His defense was that the permit authorized the work under the statute which legalized "construction * * * which shall have been started within ninety days * * *." During the ninety days he removed trees and stumps, graded, set stakes at the four corners of the building to mark the grade levels, hauled a quantity of stone to the site and contracted to have trenches dug and concrete poured for the foundation. The Supreme Court of Appeals of Virginia held that these doings did not add up to the beginning of construction, citing the Webster's New International Dictionary (2d Ed., p. 572) definition of construction as follows:

" '(1) Process or art of constructing; act of building; erection; act of devising and forming; fabrication; composition; also a thing constructed; a structure. * * * (3) Form or manner of building or putting together the parts of anything; structure; arrangement.' The word 'construct' is defined as: 'To bring together, to construct, to pile up, to set in order. * * * (2) To put together the constituent parts of (something) in their proper place and order; to build; form; make; as, to construct an edifice,' "

and noting the administrative practice (as having weight) that a building permit was not required for work on land but was required before concrete footings could be poured for the foundation of a building.

In *Arkansas Power and Light Co. v. Federal Power Commission,* 125 F. 2d 982, the Circuit Court of Appeals for the Eighth Circuit held that the Commission was justified in revoking a permit to build a dam because the permittee had not commenced construction within the prescribed time, although several thousand yards of earth at the base of the site for the dam had been excavated for exploratory trenches, a portion of the foundation had been excavated and some $10,000 spent. The Court upheld the Commission's finding that the work done was preliminary work, incident only to the commencement of construction and did not constitute the beginning of construction of the dam.

We find significant support for our conclusion that the decisions cited above holding that construction had not begun in factual situations analogous to that before us in the fact that the Company did not obtain a building permit from Calvert County or a construction permit from the AEC until months after July 1, 1968, although it would have violated the law under both the local and the federal statute and binding regulations had it commenced construction before obtaining the permits.

To the Company's argument that all the various steps

it took and acts it did before July 1, 1968 must be considered together and that their cumulative effect adds up to the beginning of construction, two refuting answers come quickly to mind. First, the Company really relied only on the moving of the earth to level the site as the evidence of the beginning of construction and the law is that such activity does not suffice. Second, no one step or activity was enough to show construction and none lent weight in that regard to the others. We are reminded of Judge McSherry's observation for the Court in the second Berry will case, *Berry v. Safe Deposit Co.*, 96 Md. 45, 56, that:

> "The sum of any number of zeros will always be zero, and this is true in the law of evidence as well as in arithmetic. You may combine as many independent circumstances as you please, and if no one of them has any legal tendency to establish the fact to be proved then all of them taken together can have no greater probative value."

The order of the Commission finding that construction was begun before July 1, 1968 was not supported by substantial evidence and did not reflect the controlling law.

> *Order reversed, with costs, and case remanded to the commission for further proceedings.*

BARNES, J. dissenting:

I dissent because, in my opinion, the majority of the Court has construed too narrowly the words "begin construction. . .of a generating station" in the Act of 1968, Ch. 493, now Art. 78, § 54A of the Maryland Code, effective July 1, 1968, and has applied inappropriate criteria in reaching that narrow construction, thus misconstruing the legislative intent in regard to the applicability of § 54A.

It is apparent that the word "construction" has a broad and varied meaning. In *Webster's New International Dictionary* (2nd ed. 1949), p. 572, the noun "construction" is defined as having six general groups of meanings, two of which are relevant here:

> "1. Process or art of constructing; act of building; erection; act of devising and forming; fabrication; composition; also a thing construed; a structure."
>
> \* \* \*
>
> "3. Form or manner of building or putting together the parts of anything; structure; arrangement."

It is interesting to observe that in 8A *Words and Phrases*, Permanent Ed., 1951, under the heading "Construct; Construction" there are 16 pages (pp. 471-486) of annotations of cases construing these words in various factual situations.

The word "station" is also a word of broad meaning. It has some 16 general groups of meaning. See *Webster's, op. cit.*, p. 2462. The fourth meaning is:

> "4. The spot or place where anything stands, especially where a person or thing habitually stands, comes to a stand or is appointed to remain for a time; \* \* \*"

Courts have held that the word "station" when used in reference to railway "stations", not only includes the *building* used by the patrons of the railway, but also the railway yards or ground adjacent to the buildings. See *Hall v. Chicago B. & N. Ry. Co.*, 46 Minn. 439, 49 N. W. 239 (1891) and *Morisette v. Canadian Pac. Ry. Co.*, 76 Vt. 267, 56 A. 1102 (1904).

In some statutes, the word "construction" or the words "beginning of construction" are defined in the statutes themselves, thus relieving the Courts of the obligation to ascertain in what sense these words are used. See, for example, the National Housing Act, 12 U.S.C. § 1701 q.

(d) (7) defining "construction" as the "erection of new structures or rehabilitation, alteration, conversion, or improvement of existing structures"; 12 U.S.C. § 1749 c (g) in regard to Educational Institutions with the same definition as set forth in 12 U.S.C. § 1701 q. (d) (7), *supra*; 38 U.S.C. § 5031 (c) in regard to Nursing Facilities with the definition that "construction" means "the construction of new *buildings,* the expansion, remodeling, modification, or alteration of existing *buildings,* and the providing of initial equipment for any such buildings"; 42 U.S.C. § 292 a (2) in regard to the Public Health Service, that "[t]he terms 'construction' and 'cost of construction' include (A) the construction of new *buildings* and the expansion, remodeling and alteration of existing *buildings,* including architects' fees, *but not including* cost of acquisition of land or offsite improvements, and (B) equipping new *buildings* and existing *buildings,* whether or not expanded, remodeled or altered"; 42 U.S.C. § 295 (e) in regard to Research Facilities, containing the identical definition set forth in 42 U.S.C. § 292 a (2), *supra,* and in the regulations of the Atomic Energy Commission, 10 C.F.R. § 50.10 (b) where the term "construction" shall be "deemed to include pouring the foundation for, or the installation of, any portion of the *permanent facility on* the site; but does not include:

"1) Site exploration, site excavation, preparation of the site for construction of the facility, including the driving of piles, and construction of roadways, railroad spurs and transmission lines;

"2) Procurement or manufacture of components of the facility;

"3) Construction of non-nuclear facilities (such as turbo-generators and turbine buildings) and temporary buildings (such as construction equipment storage sheds) for use in connection with the construction of the facility; and

"4) With respect to production or utilization facilities, other than testing facilities, required to be licensed pursuant to section 104 a. or section 104 c. of the Act, the construction of buildings which will be used for activities other than operation of a facility and which may also be used to house a facility. (For example, the construction of a college laboratory building with space for installation of a training reactor is not affected by this paragraph.)"
(All emphasis supplied.)

It is significant, I think, in seeking to ascertain the legislative intent that the General Assembly *did not* place in the statute a *definitive and restrictive* definition of the words "begin construction. . .of a generating station." This is particularly significant in the light of the fact that such a *definitive and restrictive* definition *was contained* in the regulations of the Atomic Energy Commission, as we have seen, these regulations having been promulgated on September 9, 1960, long before the passage of the Act of 1968, Ch. 493. By not using a definition which *restricts* the meaning of "begin construction" of a facility on the site, I conclude—contrary to the suggestion in the majority opinion—that the General Assembly *did not intend* the words "begin construction. . .of a generating station" to have a restricted meaning.

To arrive at the legislative intent in the use of the general word "construction," with the many meanings that may be attributed to that word, one must look carefully at any modifying words and the general legislative setting in which the word and the modifying words appear. It is significant to me that nowhere in § 54A does the General Assembly use the word *"building"* or *"structure."* It did not say "begin the construction of *'any building or structure to be used in connection with'* a generating station," so that I conclude that it intended to use the phrase "construction. . .of a generating station" in its broad, sweeping meaning and not in a narrow, restricted meaning *confined to a building or structure* at the

site of the generating station. Indeed, as has been already observed, the word "station" in one of its generally accepted meanings refers to the site or place on which a "thing," *e.g.* a building or structure, stands. The use of this word, in itself, excludes the notion that the construction is limited to a building or structure. Then, too, the word "generating" with the word "station" indicates a broad and comprehensive meaning for the word "construction." These words include the steam engines, generating dynamos and indeed all of the real property, fixtures and personal property used in connection with the *generation of electricity*; and, all of these elements make up a *"generating station."* See *Todd v. McCloy,* 196 Ark. 832, 120 S.W.2d 160 (1938) ; *Fisher Elec. Co. v. Bath Iron Works,* 116 Mich. 293, 74 N. W. 493 (1898) ; and *John A. Roebling's Sons Co. v. Humboldt Elec. L. & P. Co.,* 112 Cal. 288, 44 P. 568 (1896).

In short, as I see it, the "beginning of construction" of a "building or structure" is quite different indeed from the "beginning of construction" of a "generating station," and the majority, in my opinion, has applied a narrow and limited meaning to the words contrary to the broad and inclusive meaning intended by the General Assembly.

I do not challenge or impugn in any way our holdings and those of our predecessors, as well as holdings of the highest Courts of our sister States, in the cases cited in the majority opinion in the various mechanics' lien cases and zoning cases. Those holdings, in my opinion, simply do not apply to the language involved in the instant case. Those decisions had to do with the beginning of construction of *"buildings"* and *"structures"* used in statutes having quite different purposes than those involved in § 54A. In the mechanics' lien and zoning cases, the "construction" concept was concerned only with buildings and structures. The purpose of the applicable statutes in those cases was to insure that there had been a definite commitment to the erection of that particular building or structure and that the public would be put on notice by

the overt act of construction of the *building* or *structure* on the site. Not only must there be a bona fide intention to begin and complete the building or structure, but the overt act at the site must indicate a commitment to complete *that particular building or structure*. Where a building is involved, the mere incidental grading of the site, the removal of trees, etc., is not a commitment to erect *that particular building,* but these activities could be equally useful for some other purpose or activity. Hence, the requirement that the *foundation* of *that building* be begun to evidence to the public the bona fide intention to complete *that building.* How different is the situation in the present case!

The evidence before the Public Service Commission (the Commission) and its findings indicate that there is no challenge to the good faith of the Baltimore Gas & Electric Company (Company) in beginning construction of a generating station at the Calvert Cliffs site. Indeed, as the majority opinion points out, this is not challenged in the instant case. The Company's *commitment* (as distinguished from any preliminary negotiations, ideas or plans) to constructing a generating station at Calvert Cliffs was established on December 23, 1966, when the Company agreed to purchase for $25,000,000 from the General Electric Company a turbine generator for Unit No. 1. This was some 18 months prior to the effective date of § 54A. On May 18, 1967, the Company and Combustion Engineering, Inc. signed a Memorandum of Understanding for the construction and fabrication of the nuclear steam supply system. On May 26, 1967, the Company received delivery of a deed to the site, the Company necessarily having had to purchase the generators substantially in advance of their projected delivery to the site because of the long time required for their manufacture.

Most importantly, the Company made *its first public announcement* of its intention to construct its two unit Calvert Cliffs Nuclear Power Plant on May 29, 1967. Immediately following this public announcement, the Com-

pany began preliminary physical operations at the site by drilling core borings to be used in the design of the foundation of the Plant.

On June 26, 1967, the Company placed its order for its Unit No. 2 generator from the Westinghouse Electric Company at a cost of some $25,000,000. This generator and the one already purchased from General Electric Company were specifically designed to complement the nuclear steam supply system previously purchased from Combustion Engineering, Inc. and could only be reasonably used at the Calvert Cliffs site.

Bechtel Corporation was engaged on July 31, 1967, as the general contractor for the Company with responsibility for the engineering and construction of the Nuclear Power Plant. Dames & Moore were employed by the Company in August of 1967 to make seismological studies at the Calvert Cliffs site to determine the suitability of the site for a nuclear power plant with particular reference to the ability of the land to withstand earthquakes.

Also prior to July 1, 1968, when § 54A became effective, the Company had begun to make monthly progress payments to Combustion Engineering, Inc., and by July 1, 1968, had paid that corporation in excess of $4,000,000 for the completion of approximately 20% of the engineering necessary for the nuclear steam supply system and for such fabrication and assembly of supporting Unit No. 1 as had been completed. In December 1967, Bechtel — the general contractor—had prepared a bar chart scheduling excavation at the site for June 1968. A master flow chart in February 1968 had estimated that excavation would commence on or about June 1, 1968. On January 26, 1968, the Company filed with the Atomic Energy Commission an application for a construction permit and operating license which was accompanied by the Preliminary Safety Analysis Report indicating that the plant design had so progressed as to proceed with actual physical work on the plant site.

As early as February 1968, three lumber companies undertook selective tree cutting on the site and in April 1968

C. J. Langenfelder & Sons, Inc. (Langenfelder) began mass clearing and grubbing activities at the site. Bechtel first proposed that excavation begin on May 28, 1968, orally contracted for it with Langenfelder on May 31 and confirmed the agreement by letter on June 3, 1968. Langenfelder began excavation on June 6, 1968.

The agreement with Langenfelder in regard to excavation was formalized on June 10, 1968, by a written contract which would require ultimately "unclassified excavation" of in excess of 1,500,000 cubic yards of earth down to an elevation of Plus 1; such excavation has been defined as "easily removed material." In accordance with this contract, Langenfelder removed 104,000 cubic yards of earth at the site for which Bechtel was billed $100,000. This excavation was for the purpose of establishing the level on which the nuclear reactor vessel foundations were to be constructed and excavation continued without interruption until it was completed near the end of 1968.

Subsequent to July 1, 1968, *i.e.* on July 17, 1968, the Company filed—as required by the Commission's regulations—a report written within a month after the beginning of construction, which indicated that the construction period would be from *June 1968* to December 1974. The work on the site and plant has continued without interruption since June 6, 1968.

Fred Stern, Project Manager of the Calvert Cliffs project for Combustion Engineering, Inc., testified that Combustion began work on the nuclear steam supply system in June 1967 and the work had continued to the time of the hearing before the Commission. Mr. Stern is a well qualified expert in his field, having received a Bachelor's Degree of Mechanical Engineering from City College of New York in 1956 and a Master's Degree in Nuclear Engineering from Rensselaer Polytechnic Institute in 1960. He testified that all of the major items of materials for the two units had been ordered prior to July 1, 1968. The following testimony was given by Mr. Stern on cross-examination by People's Counsel:

"Q. Now, this same system that you design

could have been placed in New York or North Carolina, could it? A. No, sir, not quite. A similar steam could and is, not the same one. There are always the particular requirements for a site and for a utility which go into the detail design of a piece of equipment like that.

"Q. Depending upon how much electricity you want to generate, is that right? A. No, not how much electricity you want to generate, necessarily, but for example, each site has a particular set of seismic requirements. So, you would have to design your structural steel in accordance with those seismic requirements, or a particular utility—"

In its opinion in this case, the Commission stated, in part, the following:

"It is perfectly clear that the Company has been proceeding with the construction of this station with all deliberate speed and under a time table that has required it to order certain component parts six to eight years in advance of the actual date on which the station will become operational, to begin physical activities at the site including among other things excavation work, core boring, clearing and grubbing, that occurred prior to July 1, 1968, and that the combination of the outside fabrication and the physical work performed at the site prior to July 1, 1968, coupled with a demonstrated continuation of this work, is construction within the meaning of the term 'begin the construction' in Section 54A.

"Moreover, the Uniform System of Accounts prescribed by this Commission for electric companies, which has been in effect for many years, requires electric companies to include in Account 321, Structures and Improvements for nuclear production, a Balance Sheet Account, the cost

of excavation including shoring, bracing, bridging, refill and disposal of excess excavated material as well as the grading and clearing when directly occasioned by the building of a structure. Accordingly, from the viewpoint of accounting treatment the clearing and excavation performed during the month of June 1968 at the site of the plant constitutes a part of the structure and improvements of the facility.

"Accordingly, it is the opinion and finding of the Commission after a full consideration of all the evidence in this case, and the review of the briefs and oral argument of counsel, that the beginning of fabrication of the major component parts of the generating station and the excavation and other physical activity at the site, coupled with the preparation and development of complete plans and entering into a contract with the general contractor and a substantial amount of performance under that contract by the general contractor, constituted the beginning of construction prior to July 1, 1968, within the meaning of Section 54A of The Public Service Commission Law; and, accordingly, the Baltimore Gas and Electric Company is not required to apply to this Commission for a certificate of public convenience and necessity under Section 54A of The Public Service Commission Law for the construction of its nuclear power plant at Calvert Cliffs, Calvert County, Maryland."

Judge Melvin, in affirming the Commission's order dismissing the petition of People's Counsel, filed a carefully considered opinion in which he stated:

"[I]t is the court's opinion that the Commission applied the correct legal test and that its order of July 31, 1969, was not clearly erroneous or unsupported by substantial evidence on the record considered as a whole."

As has been pointed out, the definition of "construction" may include "fabrication" so that the large contracts for the various units, etc., already mentioned, on which fabrication had begun for facilities for the generating station would bring the activity of the company within that broad definition. But there is much more. If notice to the public is one of the elements to be considered, the Company made a *public announcement* of its intention to proceed with the construction of a generating station at the Calvert Cliffs site on May 29, 1967, some 13 months prior to the effective date of § 54A—July 1, 1968. Commitment to the project is an element for consideration. There can be little doubt from the facts above recited that the Company was irrevocably committed to the construction of a generating station *at the Calvert Cliffs site* well in advance of July 1, 1968. If overt acts at the site are required, the evidence indicates that they too occurred. There were removal of trees, mass clearing, grubbing and the excavation of a very large amount of soil—104,000 cubic yards—done for the explicit purpose of establishing the level on which the nuclear reactor vessel foundations were to be laid. If continued and uninterrupted work on the project be required, this also has occurred.

In *Slapnicka v. City of Cedar Rapids*, 258 Iowa 382, 139 N.W.2d 179 (1965), preliminary engineering services consisting of studies, designs, traffic data, soil tests, estimates for the right-of-ways and construction costs were held to be road construction expenses and thus payable from a tax fund limited solely for the construction of roads.

I do not understand that the Company "really relied only on the moving of the earth to level the site as the evidence of the beginning of construction," as the majority states. On the contrary, as I understand it, the Company's position is that *all* of the preliminary steps already mentioned *including* the moving of the earth evidence the "beginning of construction. . .of a generating station," as these words were intended to mean by the General Assembly as already indicated. In my opinion,

this position is correct. Many of the acts prior to the excavation work are evidence of the beginning of such construction and firmly committed the Company to the construction of a generating station at the site as all concede was its bona fide intention to do and this intention has been, and continues to be, carried out.

In summary, all of the elements required for the beginning of construction of a *generating station* were present and found by the Commission to have been present prior to July 1, 1968, the effective date of § 54A, within the broad and inclusive language used by the General Assembly. The Commission is by its very nature and by its particular relationship to the legislation in question especially qualified to aid the Courts in the discovery of the legislative intent. Its contemporary construction of the legislation is entitled to great weight by us if it be thought that the language is ambiguous, which I do not consider it to be. *Department of Tidewater Fisheries v. Sollers,* 201 Md. 603, 615, 95 A. 2d 306, 311 (1953). See *Department of Motor Vehicles v. Greyhound Corp.,* 247 Md. 662, 669, 234 A. 2d 255, 258 (1967).

The majority, in my opinion, has placed this Court in the curious position of forcing jurisdiction upon a regulatory Commission which the Commission itself abjures. This is novel, to say the least.

I would affirm.

I am authorized to state that Judge McWilliams concurs in the views herein expressed.

## ON MOTION FOR CLARIFICATION

PER CURIAM.

The Company has filed a motion that the Court "clarify" the opinion filed herein October 23, 1970, holding that construction of the Calvert Cliffs Nuclear Generating Station had not begun on July 1, 1968, and remanding the case to the Commission for further proceedings. The Commission then moved that the Court rule as soon as possible upon the Company's motion so that it would be known whether the Commission must order that further construction of the generating station cease until the Commission has determined whether a permit should

or should not be issued under § 54A of Art. 78 of the Code.

The question of whether further construction must or should cease if this Court should decide that construction had not begun by July 1, 1968 was not presented to or decided by the lower court and was not argued, in the briefs or orally, or otherwise presented to this Court for decision, and was not decided by us. There is nothing in the opinion or mandate that requires expressly or by implication that construction must or should halt, or that it can or should continue.

This Court does not give advisory opinions and will not undertake to tell either the Commission or the Company what to do or not to do except to the extent that the record requires or makes it appropriate to do so. The Commission should hold the hearing and make the determinations specified by § 54A of Art. 78 as soon as reasonably possible and the Company should facilitate the fastest progress reasonable under the circumstances.

When the Company originally determined on its own that it did not need a permit from the Commission to begin and to continue construction of the generating station, it proceeded at the risk that the determination might eventually be judicially held to have been wrong, and at the further risk that a permit might never be granted or be granted so as to require modification of the plans for the station. These risks continued after the Company persuaded the Commission to rule that the Company's original determination that no permit was needed was correct, since the Commission's order was subject to reversal in the Courts. If construction is now continued, pending action by the Commission under § 54A, the risk that what has been constructed cannot be used as a generating station because no permit will be granted or a qualified permit issued is clearly on the Company. We offer no judicial estimate of what the proper odds should be that no permit be granted or that the permit issued will require modification of plans, suggesting only that it is up to the Company to make this forecast.