RUPP et al., TRUSTEES, et al. v. EARL H. CLINE
AND SONS, INC., et al.

[No. 155, September Term, 1962.]

*Decided February 7, 1963.*

*Motion for rehearing filed February 25, 1963, denied April 3, 1963.*

Appeal from the Circuit Court for Frederick County (Cobey, J.).

Earl H. Cline and Sons, Inc., claimed a preference for its mechanics' lien over a deed of trust of which Christopher A. Rupp and Sidney H. Tinley were the trustees. From an order granting the preference, the trustees appealed.

The cause was argued before Henderson, Hammond, Prescott, Horney and Sybert, JJ.

*Walter C. Mylander, Jr.,* and *Charles C. W. Atwater,* with whom were *Carlyle Barton, Jr.,* and *Herbert L. Rollins* on the brief, for appellants.

*Robert E. Clapp, Jr.,* and *Benjamin B. Rosenstock,* with whom was *H. Reese Shoemaker, Jr.,* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

This appeal is from an order allowing the mechanics' lien claims of the claimants-appellees (Earl H. Cline and Sons, Inc., et al.) priority in the distribution of proceeds of a foreclosure sale under a deed of trust held by the trustees-appellants (Christopher A. Rupp and Sidney H. Tinley, Jr., trustees under deed of trust from James T. Galloway Company, a body corporate). Subsequent to the filing of the foreclosure proceedings by the trustees, the claimants filed a petition alleging that work done on the foreclosed premises had begun prior to the recording of the deed of trust and prayed that the lien of the trustees be subordinated to those of the claimants.

James T. Galloway and Alfred F. Flynn were the sole stock-holders in equal shares of two corporations: The K. & G. Construction Company (K & G) and the James T. Galloway Company (Galloway).

In December of 1958, K & G purchased a fifty-acre tract of land in Frederick (from Frederick Homes, Inc.) to be developed for cottages and apartments. Preliminary subdivision plans for the whole development were prepared in March of 1959 and filed with the planning commission in April of that year. But, although the owners contemplated erecting apartment units for one hundred and twenty families on a part of the tract, they did not furnish detailed plans for the apartments at that time and the commission reserved its decision as to the apartments for further consideration.

Construction of the cottages was begun as soon as the deed for the tract from the seller to K & G was recorded in June of 1959. At or about the same time, the then owner applied to a mortgage broker for a loan to construct the apartments, but the formal application for financing the project was not sub-

mitted by the broker to the lender on behalf of Galloway (not K & G) as borrower until September 10, 1959.

During the summer of 1959, when K & G needed fill for the area around the cottages then under construction, some was moved in June and July (by whom it is not clear) from an area that was not a part of the apartment site. But on September 5, 7, 8 and 9, K & G directed a contractor (Earl H. Cline and Sons, Inc.) to "borrow" additional fill from the site on which apartments were subsequently built for the cottage site. Before proceeding, Cline advised the owners that soil ought not to be moved from one area to another if houses were to be built on the former, and was informed that since apartments were to be constructed thereon, it would not be necessary to replace it. At this time Cline, who was operating under a contract with K & G relating to the cottage project, was not given any grading instructions but was told not to cut below the curb line of the nearby shopping center. Cline was paid for removing the soil as a part of the cottage project: the contract under which Cline later worked on the apartment project was not submitted until December 31, 1959. Pursuant to instructions, Cline, in removing some 2000 cubic yards of soil to a depth of from four to six feet in some places, leveled the apartment site to the approximate grade needed. And when the excavation work for the slab ground floor of the apartment project was begun five months later, little grading was required with respect to two of the apartment buildings, although some soil had to be returned to the apartment site from another part of the tract.

The proposed planning that had been filed in April, and was still pending before the planning commission, was abandoned in mid-September of 1959, and a new plan was filed seeking approval of the contemplated 120-unit apartment project on the same site. When the project and plan were approved by the commission, K & G sought rezoning of the 4½ acre apartment site from Residential C to Residential B. This was necessary in order to construct 120-unit apartments. Due notice having been given of the application for rezoning, the Mayor and Aldermen of Frederick held a public hearing as advertised, but reserved their decision on the matter.

When rezoning had not been granted after the expiration of more than forty days—and the lender in the meantime had given its commitment for the financing of a 48-unit apartment project — the request for rezoning was withdrawn, the withdrawal was approved by the city, and, in November of 1959, Galloway, as owner, and K & G, as builder, applied for permission to proceed with building a 48-unit apartment project which did not require rezoning. The permit was finally issued on December 21, 1959, and about two weeks later a utility contract with the city was also approved, but a formal contract was never executed.

A deed from K & G conveying the apartment site to Galloway was executed on December 29, 1959, and was recorded on the 31st. On the same day Cline submitted its proposal (never formally accepted by either K & G or Galloway) for grading and excavating work at the apartment site,[1] but it was not until after traverse lines had been run and two apartment buildings were staked out early in February of 1960 that Cline began excavating for the foundations.

The construction loan was finally approved on January 12, 1960, the deed of trust and note were executed on January 25, and the deed of trust was recorded on January 27. In the afternoon of the same day an agent of the title insurance company and a salesman for K & G went to the premises and took photographs, which clearly showed that soil had been removed from the site sometime before, but did not show any stakes, trenches, excavations for foundations or other evidence of the commencement of a building.

The discovery on August 15, 1960, of the absence of utilities for the project, brought about foreclosure of the deed of trust and a sale of the apartment premises.

The chancellor, being of the opinion that limiting the commencement of a building to the digging of the foundation was to ignore modern building practices, found a continuing intention on the part of K & G and Galloway to erect apartments as soon as they acquired the necessary financing and author-

---

1. Specifically, Cline proposed to "strip and stockpile topsoil"; to "excavate and rough grade site"; to "excavate foundations (no footers)"; and to "replace topsoil and fine grade as per plans."

ity to proceed and that the excavation work done in February of 1960 was a continuation of the grading work done in September of 1959, and decided that the claimants were entitled to priority over the trustees in the distribution of the net proceeds from the foreclosure sale.

While numerous primary and secondary questions are presented by the appeal, it is not necessary to consider all of them. The principal question is what constitutes the commencement of a building within the meaning of the mechanics' lien law.

It is clear that if any lienable work was done for or about the apartment site before the recording of the deed of trust which could be said to be the "commencement of [the] building," then the liens of the claimants would "be preferred." Code (1957), Art. 63, § 15. But, as we see it, that was not the case here.

At the outset we point out that § 1 of Art. 63, which defines to what and for what a mechanics' lien attaches, has been amended from time to time, to include many things, besides work done on and materials furnished for a building, such as services for "grading, filling and landscaping." But the provisions of § 15 (of Art. 63), relating to preference over other liens, which were enacted by Ch. 205 of the Laws of 1838, have never been changed, except for an amendment as to form made by Ch. 287 of the Laws of 1845.

The effect and meaning of the provisions of § 15 of Art. 63 were considered and construed by this Court in three early cases. In the first of these, *Brooks v. Lester,* 36 Md. 65 (1872), where the question was whether the driving of pegs into the ground in laying out a house was sufficient to constitute the beginning of construction, it was said, among other things, that the commencement of a building is the first work done on the ground which is made the foundation of the building and forms a part of the work suitable and necessary for its construction.

In the second case, *Jean v. Wilson,* 38 Md. 288 (1873), where the question was whether the construction of foundation walls at the time building lots were being filled and graded (with the intention of erecting houses thereon in the future) in order to avoid the expense of subsequent excavation for cellars constituted the commencement of a building, it was held that the mortgagees were entitled to priority.

Finally, in *Kelly v. Rosenstock,* 45 Md. 389 (1876), where the driving of stakes and the digging away of soil to level the ground prior to beginning construction were held not to be the commencement of the building, the principles of law laid down in the two preceding cases were restated thus (at p. 392) :

> "We have said in *Brooks v. Lester,* * * * that what the law means by the *'commencement of the building'* is 'some work or labor on the ground, such as beginning to dig the foundation, or work of like description, which every one can readily see and recognize as the commencement of a building,' and in *Jean v. Wilson,* * * * we held that such work must be done with the intention and purpose *then formed* to continue it to the completion of the building, and that the work done on the ground without any design or purpose of constructing a building *at that time,* and which was intermitted, is not sufficient."

These cases make it clear that before there can be the *commencement of a building* which would give a mechanics' lien claimant a preference over a recorded mortgage there must be (i) a manifest commencement of some work or labor on the ground which every one can readily see and recognize as the commencement of a building and (ii) the work done must have been begun with the intention and purpose then formed to continue the work until the completion of the building. If either of these elements is missing then there has been no "commencement of the building" within the meaning of § 15 of Art. 63.

The cases in other jurisdictions are generally in accord. See, for example, *Fryman v. McGhee,* 163 N. E. 2d 63 (Ohio 1958) ; *Connecticut Gen. Life Ins. Co. v. Birzer Bldg. Co.,* 101 N. E. 2d 408 (Ohio 1950) ; *Ustruck v. Home Ass'n,* 207 N. W. 324 (Minn. 1926) ; *North Shaker Blvd. v. Harriman Nat. Bank,* 153 N. E. 909 (Ohio 1924) ; *Kiene v. Hodge,* 57 N. W. 717 (Iowa 1894) ; *Pennock v. Hoover,* 5 Rawle 291 (Pa. 1835). See particularly *National Lumber Co. v. Farmer & Son, Inc.,* 87 N. W. 2d 32 (Minn. 1957), where the Court, in finding that the erection of a fence around a tree on the premises (that had been paid for prior to the execution of the construc-

tion mortgage) was not the actual and visible beginning of the building but was several and separate from the work done on the house, had this to say (at p. 36) with regard to the transactions:

> "[T]he line of distinction is whether or not the improvement bears directly on the construction of the building rather than whether it is a part of the overall project involved. * * * And where excavation is involved, it appears that the excavation itself or something directly connected therewith, rather than any prior activity, constitutes the beginning of the visible improvement."

It may be that the abandonment of the 120-unit apartment project, and the undertaking to build the 48-unit apartment project instead, was such a change of plan as would, in any event, prevent the mechanics' liens from relating back to the time when the apartment site was graded or leveled in the early part of September of 1959, but even if it is assumed (for the purposes of this case) that there was no substantial change of plan and that the owner and builder had a continuing intention —if and when they could get financing and permission—to erect apartments of some type, we think it is apparent that the removal of soil from one part of the development to another even for the dual purpose of grading one site to a specified level and filling in the other to the required height was at most a preparatory operation that was not the "commencement of the building." While the removal of soil had the effect of leveling the apartment site, that fact did not constitute *commencement* for the purpose of fixing the time to which a lien could relate. *Kelly v. Rosenstock, supra.* Nor did the grading or leveling— since there was no work on the ground which everyone could readily see and recognize as the commencement of a building, *Brooks v. Lester, supra*—have the effect of putting the party making the construction loan on notice that the building had been commenced, and we so hold.

To hold otherwise would be contrary to the previous decisions of this Court. If any change in the meaning and effect of § 15 (of Art. 63) is either desirable or required that is a matter for the legislature, not the courts, to consider.

With this holding we do not reach the remaining questions presented by the trustees-appellants concerning the requirement of notice to an owner of intention to claim a lien and the entitlement of a claimant to a lien for grading a public thoroughfare into and through the apartment site. Nor is it necessary—since it appears that taxes for the then current year had been paid in advance—for us to consider the contention of the claimants-appellees that the lender made further advances to the borrower after it had defaulted. Similar contentions were made and decided in *Rupp, et al., Trustees v. Johnston Co.,* 226 Md. 181, 172 A. 2d 875 (1961).

> *Order reversed and case remanded for the entry of an order in conformity with this opinion; the appellees to pay the costs.*