FRANK J. KLEIN & SONS, INC. ET AL. *v.*
LAUDEMAN ET AL., TRUSTEES

[No. 9, September Term, 1973.]

*Decided November 1, 1973.*

*Motion for rehearing filed November 29, 1973; denied and mandate modified December 5, 1973.*

The cause was argued before MURPHY, C. J.. and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*George Barrett Johns,* with whom was *James T. Smith* on the brief, and *Robert K. Parker,* with whom were *Dulany & Davis, Edward Pierson* and *Ronald L. Spahn* on the brief, for appellants.

*Maurice F. Mackey, Jr.,* and *Edward C. Mackie* for appellees.

DIGGES, J., delivered the opinion of the Court.

Reduced to its common denominator, the contention made by each of the parties to this appeal, expressed in today's vernacular, is that "we're number one" in the distribution of $178,000, proceeds after expenses, received from a foreclosure sale. This dispute comes before us from an order of the Circuit Court for Carroll County denying priority to the mechanics' lien claims of appellants, a general contractor (Carroll W. Hynes Builder, Inc.) and two subcontractors (Carpet Land Inc. and Frank J. Klein & Sons, Inc.) to that of a deed of trust securing a $200,000 note held by Baltimore Federal Savings and Loan Association. The property securing the note is located on Oakland Mills Road in Carroll County and is improved by a nursing home for which the appellants had supplied labor and materials and for which Baltimore Federal had provided the financing. Following ratification of the sale conducted by trustees, James D. Laudeman, Jr. and Robert F. Vavrina, appellees, the auditor's report directed that all of "the funds available for distribution [be] distributed to the Baltimore Federal Savings & Loan Association, a body corporate, [as owner of the note], in partial liquidation of its [$185,759.61] claim". The appellants having mechanics' lien claims totalling $79,936.90 and relying on Maryland Code (1957, 1972 Repl. Vol.) Art. 63, § 15, allege that work done on the foreclosed premises had begun prior to the recording of the deed of trust. It is from the overruling of these exceptions and the ratification of the auditor's report by Judge E. O. Weant, Jr. that the exceptants noted this appeal.

The story of this project begins in early 1967 when Mr. and Mrs. Spottswood Bird, then owners of unimproved acreage, acquired temporary zoning approval for the construction of a nursing home. However, nothing more was accomplished in furtherance of their plan until one year later when they obtained a year's extension of the zoning approval and secured a building permit. Formal construction arrangements began in the summer of that year when the Birds, joined by a co-promoter Willis

Hindman, got in touch with Carroll Hynes, president of Carroll W. Hynes Builder, Inc., to seek his assistance in their designing of the nursing home. Hynes quickly acceded to this request and, pursuant to an agreement, submitted plans, specifications and a construction bid to the three developers. Nevertheless, after this step was taken, for a number of months the Birds' idea again lingered in the incubation stage.

It was not until January of 1969 that the events which are of particular interest to us in this appeal began to take shape. Because the construction permit and the zoning certificate were about to expire in February of that year, in order to extend their lives, Hynes was requested by the promoters to commence work on the project despite the fact that there existed no formal construction contract between them. It is undisputed that the builder complied with this request and by February 13, 1969 the site had been surveyed, the land graded and at least 80% of the footings poured. Work continued throughout the remainder of the early spring with Hynes completing the foundation, building vanities for the home in his shop off the site, and ordering heating units which were later incorporated into the walls of the building.

Fate once more declined to smile upon completion of the nursing home. Despite the creation of Lakeview Acres, Inc. by Hindman and the Birds, the deeding of the site to that corporation, and its execution of a six months' construction contract with Hynes in mid-April 1969, difficulties in obtaining state approval, bank financing and completion bonds forced a slow down in the project. In fact, it was not until the summer of 1970 that full scale construction was renewed. Once recommenced, work continued until 1971 when the nursing home was completed as originally designed with the exception of minor modifications. Throughout this hiatus, extending from April 1969 to July 1970, with Hynes' assistance when needed, efforts were made to overcome those obstacles which had fallen in their path. Included was the substantial help he gave the corporation in its successful effort to obtain the $200,000

loan from Baltimore Federal. Ironically, it was the fact that the savings and loan association's deed of trust, given to secure that loan, was recorded prior to the resumption of work and then subsequently foreclosed that forced Hynes and his two subcontractors to join in litigation in an attempt to gain priority for their mechanics' lien claims.

Each of the exceptants contends that the building of the nursing home commenced prior to the recording of Baltimore Federal's deed of trust and rely, as already mentioned, on § 15 of Art. 63 of the Code to establish the preference of their lien for the labor and materials which they provided in the construction of that building. The issue becomes, therefore, whether the evidence demonstrates that construction commenced prior to the recordation of the trust. As this is essentially a mixed question of law and fact the resolution of that dispute is to a great degree dependent upon a consideration of whether the trial judge was clearly in error (Maryland Rule 886) in making the series of factual determinations which led him to conclude that the evidence had not.

We turn first to a consideration of the mechanics' lien statute as it applies to the facts of this case. Art. 63, § 15 provides:

> "The lien hereby given shall be preferred to all *mortgages*, judgments, liens and encumbrances *which attach upon the said building or the ground covered thereby subsequently to the commencement thereof;* and all the mortgages and liens other than liens which have attached thereto prior to the commencement of the said building and which by the laws of this State are required to be recorded *shall be postponed to said lien, unless recorded prior to the commencement of said building.*" (Emphasis added.)

In considering the application of the facts in this case to that section it becomes important at the outset to examine the meaning of the phrase "commencement of the said building." Fortunately, we have already construed this

language in *Rupp v. Earl H. Cline & Sons*, 230 Md. 573, 188 A. 2d 146 (1963) where it was said:

> "[The] cases make it clear that before there can be the *commencement of a building* which would give a mechanics' lien claimant a preference over a recorded mortgage there must be (i) a manifest commencement of some work or labor on the ground which every one can readily see and recognize as the commencement of a building and (ii) the work done must have been begun with the intention and purpose then formed to continue the work until the completion of the building. If either of these elements is missing then there has been no 'commencement of the building' within the meaning of § 15 of Art. 63."

It follows then that the appellants must vault these two hurdles before they are able to claim victory in their race for priority.

### (i) *Work on the Ground*

The appellees argue, contrary to the findings of the trial judge, that there had been no commencement of work which could be seen from a view of the premises before the lien created by the deed of trust had attached. In so doing, they rely on the decisions of this Court in *Brooks v. Lester*, 36 Md. 65 (1872), and *Kelly v. Rosenstock*, 45 Md. 389 (1876) in which only minimal labor had been performed upon the ground. In *Brooks*, prior to the recording of the trust instrument the work was confined to the placing of pegs into the ground in laying out a house and, in *Kelly*, to the driving of stakes and the digging away of soil in an effort to level the terrain. Clearly, as here there was considerably more building activity, appellees' confidence in those cases is misplaced. The record before us indicates that, although at the time the deed of trust was recorded the site was partially covered by a year's growth of weeds and grass, it also demonstrates that an inspection of the site would have revealed that grading had been accomplished,

the concrete with reinforcement rods had been poured for footings, and vanities built off the project had been stored on the site. In fact, this commencement of construction was confirmed by Edmund W. Ward, an attorney retained to inspect the site for Baltimore Federal at the time it recorded the trust. When called as a witness by the appellees, he testified on cross examination as follows:

Q. "But it was obvious that a building construction had commenced on the, building structure, on the property, wasn't it?

A. No question about that."

Appellees are bound by their agent's response and accordingly we pass to the second hurdle.

### (ii) *Intention and Purpose*

It was partially because the trial judge found this element lacking that he overruled the exceptions made by the mechanics' lien claimants to the auditor's report. In so doing, Judge Weant was influenced by his conclusion that "the admitted primary and only purpose for commencement of construction on or about February 9, 1969, was to prevent the invalidation of the building permit and zoning certificate which were about to expire." However, after reviewing the record, we conclude that the trial judge was clearly in error in reaching this determination. Rule 886. We say this because even if it is assumed that preservation of the zoning permit was the primary purpose for beginning construction in February of 1969, this intention is not incompatible with the second test set out in *Rupp*. In fact, it is entirely consistent. The abrupt commencement of work, in an effort to save the life of the required zoning and building permits, certainly indicates a desire to see the nursing home completed. It would be unreasonable to suppose that one would go to such great lengths to preserve the right to pursue a project and at the same time entertain no intention of completing it. The testimony of Spottswood Bird, one of the principal stockholders in Lakeview Acres and a personal guarantor of the Baltimore Federal note, that "my zoning

was going to expire and that the only way I could protect it would be to start some type of work on that property that would indicate *intention to go ahead* with a nursing home project" lends substantial support to our interpretation of these facts (emphasis added). Clearly, work which was admittedly performed to demonstrate an intention to pursue a project to completion for zoning purposes is also, we think, sufficient to show that very same intention which is also a requirement of the mechanics' lien law. Bird's admission therefore becomes appellees' swan song on this question.

The appellees finally contend, in the alternative, that even if construction had been initiated with a desire to see it to completion, the facts show that this intention was subsequently abandoned. Apparently recognizing that his factual determination which we have just discussed is subject to dispute, Judge Weant proceeded to consider and adopt this argument as well. In deciding in appellees' favor on this point the judge concluded that "there was a drastic change in the attitude of the parties to the extent that their actions, particularly that of the contractor, indicated the intention to abandon the undertaking." And, as the trial judge fortified his final decision with this additional reason, we must proceed to consider once more whether this conclusion was also clearly in error.

In urging us to reverse this latter conclusion of the trial judge, the appellants make the threshold contention that "Maryland does not recognize that the 'commencement' of construction once vested under Article 63, Section 15 may be abandoned by a delay in the construction thus dating the attachment of liens for work and materials subsequently furnished from a 'recommencement.' " The problem with this argument is that by limiting the inquiry to an investigation of whether the work has been interrupted for too long a period, appellants over simplify the question. The issue more correctly stated is whether there had been sufficient cessation of work to constitute the end of construction on one project and the initiation of work on another. Clearly, where work ceases as a result of the completion of the building or the total desertion of the

undertaking there can be no question but that construction of the project in a sense has been abandoned. It is only in those cases in which work ceases and later resumes that the problem as to whether there has been an abandonment arises. And, as the nursing home in this case had certainly been neither completed nor completely forsaken before the recording of Baltimore Federal's lien, it is a ratiocination of that problem which is before us in this appeal.

In those cases where construction stops and is later resumed, whether there has been a sufficient cessation of work to constitute the end of construction of one project and the initiation of work on another becomes an inquiry into intention. If the initial desire to complete a project dissipates to such a degree that construction stops with no intention at that time of ever proceeding as originally planned, a mechanics' lien for labor and material provided after a fresh commencement of work on a new project cannot possibly relate back to the commencement of the abandoned structure. This is so because a lien attaches to an individual project and if there is an objective manifestation of intent that the work on that project should come to a halt, only the construction performed before work ceases pursuant to that intention has a lien priority. The objective manifestation of such an intent to abandon the project can be demonstrated by a material change of design under a new contract, or a complete stoppage of work for a period of time sufficient in duration to exhibit an intention completely incompatible with any desire to finish the original structure, or other strong evidence of such an intent. What constitutes a sufficient change of design has been, we believe, correctly delineated by Judge Sharswood whose opinion as a trial judge was adopted by the Pennsylvania Supreme Court as its opinion in *Norris' Appeal*, 30 Pa. St. 122 (1858). There the judge lucidly stated:

> "The true question, then, is, was the whole establishment erected on substantially one plan and design from the commencement, or was the plan or design so materially changed during the

progress of the work as to make the whole a different building from that which was or would have been erected had no such change taken place? I use this language cautiously, to exclude the idea that any project of subsequent alteration, whether vague or certain, whether entertained at the commencement or suggested during the progress of the building, and not embodied in the actual plan upon which it was commenced and carried on, could make any difference . . . . It may be safely conceded that unimportant alterations in the plan, such as the height or number of the stories, the arrangement and finish of the rooms, or even the addition of one or more outhouses, not materially altering the character, would not affect the rights of subsequent claimants."

Therefore a delay in construction or a mere modification of a plan would not be sufficient; the building which is eventually completed must be essentially different from the one first planned for a court to say that it had been abandoned. *Federal Land Bank of Spokane v. Green*, 108 Mont. 56, 90 P. 2d 489 (1939); *Haxtun Steam-Heater Co. v. Gordon*, 2 N. D. 246, 50 N. W. 708 (1891); *Kelly's Appeal*, 1 Pa. Cas. (Sadler) 280, 2 A. 868 (1886); *Schroeter Bros. Hdw. Co. v. Croatian "Sokol" G. Ass'n*, 332 Mo. 440, 58 S.W.2d 995 (1932). See also *S. Phillips, A Treatise on the Law of Mechanics' Liens on Real and Personal Property*, §§ 218-220 (1883).

If the issue is phrased in these terms, it is clear that Maryland recognizes abandonment in this context, for in *Rupp*, 230 Md. at 579 we used the following language:

"It may be that the *abandonment* of the 120-unit apartment project, and the undertaking to build the 48-unit apartment project instead, was such a change of plan as would, in any event, prevent the mechanics' liens from relating back to the time when the apartment site was graded or leveled in

the early part of September of 1959." (Emphasis added.)

By making this observation, we were merely affirming that which was already clear but which has not been necessary to depict in detail until now. However, for a court to conclude that the resumption of work after a delay is a new project so as to prevent the relation back of a lien for work and material subsequently supplied, it must bear in mind that the purpose of the mechanics' lien law is to protect the materialmen and that this law is to be construed in the most liberal and comprehensive manner in their favor. *Reisterstown Lumber Co. v. Reeder*, 224 Md. 499, 507, 168 A. 2d 385 (1961).

Having decided that the character of a project may be so altered or the work on it so delayed that it can be said that the original one may be considered to have been abandoned, we proceed directly to a consideration of whether Judge Weant was clearly in error in reaching his conclusions that the nursing home here had met that fate. The trial judge supported his finding with the following facts:

"Materials were ordered and delivered to the job. The builder took out a general risk insurance policy which was paid for July 17, 1969. There was a contract entered into between [appellant Hynes] and Lakeview Acres, Inc. dated April 23rd, 1969. Work was started.

Now consider what happened to these facts after the work stopped and prior to the renewal of activities on the job in July of 1970. In April of 1969, *work came to an end and was not resumed for over a year thereafter. The builder cancelled its risk insurance policy* in September of '69. *Weeds grew up over the area* and practically obliterated the work which had been done. The original *contract was renegotiated* as to price and some of the plans. The excavation of the *footers were paid for.* Other *payments were shut off.* The *heating units and*

*vanities were not used until work was started in July of 1970."*

Upon careful consideration of this statement we can glean only two legally significant factors: (i) work had ceased and (ii) the contract price was renegotiated and minor changes in the plans were agreed upon. The remainder is either merely further evidence of the delay (weeds had grown up), or insignificant details (work performed was paid for) or evidence which could just as likely demonstrate a continuous course of conduct toward completion rather than an indication of an intention to abandon a plan (custom made vanities were not incorporated into the building until construction had reached a proper stage). The facts relied on by Judge Weant are clearly insufficient to meet our definition of abandonment. In the first place, although there was a significant stoppage of work for a number of months, this was due to a snafu[1] not unheard of in the construction of such projects (loss of financing, failure to procure a bond and state approval). Secondly, there was no evidence of an intention to ever give up the project. In fact, as we have discussed above, the promoters aided by the builder, more or less over that entire period, made a continuous effort to overcome the obstacles which appeared in their path. This shows quite the contrary intent. And thirdly, there was no material change of design under a new contract. The renegotiation of the original contract mentioned by the trial judge concerned only price adjustments to reflect increased costs and minor details in design. The nursing home originally planned in the summer of 1967, while delayed and slightly altered, was essentially the same building, constructed on the same foundation, using the same design, and serving the same purpose as the one eventually completed. This delay and the minor alterations are not sufficient evidence of abandonment of the original project and to conclude that they are was clearly erroneous. Rule 886. We accordingly reverse Judge Weant's order which

---

1. Snafu is an army term meaning "Situation Normal All Fouled Up." *Webster's Third New International Dictionary* at 2154 (3d ed. 1961).

overruled the appellants' exceptions and ratified the auditor's report.

> *Order of November 14, 1972*
> *overruling the exceptions of the*
> *appellants to the auditor's*
> *account reversed.*
>
> *Case remanded for passage of an*
> *order sustaining appellants'*
> *exceptions and then, following*
> *further proceedings to deter-*
> *mine the unresolved issues set*
> *forth in the October 2, 1972*
> *stipulation of the parties, for*
> *the passage of an order direct-*
> *ing the auditor to state the ac-*
> *count so as to reflect a priority*
> *of appellants' claims, to the ex-*
> *tent any of them are sustained,*
> *over the claim of the Balti-*
> *more Federal Savings and*
> *Loan Association.*
>
> *Costs to be paid by the Baltimore*
> *Federal Savings and Loan*
> *Association.*