623 A.2d 1296

**PRINCE GEORGE'S COUNTY, MARYLAND**

v.

**SUNRISE DEVELOPMENT LIMITED PARTNERSHIP et al.**

**No. 81, Sept. Term, 1992.**

Court of Appeals of Maryland.

April 22, 1993.

Reconsideration Denied June 4, 1993.

298

Andrea Leahy–Fucheck, Associate County Atty. (Michael P. Whalen, County Atty., Albert J. Lochte, Deputy County Atty., all on brief) Upper Marlboro, for petitioner.

Russell W. Shipley (Michele LaRocca, Meyers, Billingsley, Shipley, Rodbell & Rosenbaum, P.A., all on brief) Riverdale, for respondent.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr. Judge of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

In this case the developer of a proposed twelve-story apartment building contends that the project was sufficiently advanced on May 1, 1990, to prevent downzoning. The developer's vested rights argument ultimately rests on a single footing, one that was placed in the ground during the preceding December for a proposed column at a proposed outside corner of a proposed portico. The Prince George's County Board of Administrative Appeals (the Board) concluded that rights had not vested in the project. The Circuit Court for Prince George's County reversed. The Court of Special Appeals, in an unreported opinion, affirmed

the circuit court. We granted the petition of Prince George's County for certiorari. As hereinafter explained, we shall reverse the courts below and direct reinstatement of the order of the Board.

The site, comprising 9.9591 acres, lies southeast of the interchange of the Baltimore–Washington Parkway with the Capital Beltway. The site's western boundary abuts the Capital Beltway, but without access to that highway. To the north of the site is a business park that includes a hotel. To the south of the site are garden apartments. Proposed access to the site is in its northeast corner, via Hanover Drive which joins Hanover Parkway, which runs northeasterly to intersect Greenbelt Road, a major artery. The site has never been developed, and it is primarily woodland.

Since the 1960s the site had been zoned R–10 (multifamily high-density residential). In the mid–1980s an area which included the site was annexed by the City of Greenbelt. Sunrise Development Limited Partnership (Sunrise), the respondent, was formed in October 1986 to develop the site. There was evidence that the total project expenses incurred by Sunrise through May 1990 were approximately $2,150,-845.[1]

On September 28, 1989, the Prince George's County Planning Board (the Planning Board) approved, subject to certain conditions, a site plan for "Sunrise Apartments," a project of 467 dwelling units and a total of 885 underground and outdoor parking spaces. The plan reflects outdoor parking spaces on both sides of a driveway around the perimeter of the property, with the apartment building roughly centered on the site. The building would consist of a center core with two V-shaped wings, one on the north

---

1. A Sunrise exhibit breaks this figure down into legal, accounting, and insurance of $123,015, architectural and engineering of $272,276, loan interest, real estate taxes, and "Etc." of $1,732,369, and miscellaneous expenses of $23,185+. Miscellaneous expenses include appraisal fees, consulting fees, and bond/permit fees. Project expenses do not include the cost of land.

side and one on the south. The plan is marked "Maximum Building Height = 110 [feet]." Entrance to the core is on the east side of the building. The arms of the V-wings on the entrance side of the building would be approximately 140 feet in length while the arms of the V-wings on the rear, or Capital Beltway, side of the building would be approximately 190 feet in length. The site plan shows a circular driveway in front of the core which passes through or under an extension from the core. This extension was referred to before the Board as a portico. Structural, construction, or detail drawings of the highrise building have never been prepared.[2]

The site plan depicts underground parking beneath both arms of each of the wings of the structure. One of the Planning Board's conditions of approval of the site plan was that Sunrise obtain a variance from the zoning ordinance requirement of less than twenty-five percent coverage for the proposed parking structures. Sunrise was granted that variance on February 13, 1990. Another condition of site plan approval was the recording of an approved relocation of the easement for storm water drainage. The relocated easement was recorded December 12, 1989.

On October 13, 1989, Sunrise applied to the Prince George's County Department of Environmental Resources (DER) for a permit for a "new structure" and grading. Accompanying the application was a site drawing captioned, "Column Footing and Rough Grading Plan." The drawing reflects the proposed topography, notes that the total disturbed area would be 9.6 acres, and notes that the grading would be completed in eighty days. Superimposed on the topographical representation is the outline of the proposed building. At the northeast corner of the proposed portico the drawing shows a small square marked, "Install Column

---

2. There was introduced at the Board hearing an architect's concept of what the building would look like from a point approximately 100 feet above ground level near the intersection of Greenbelt Road and the Baltimore–Washington Parkway. That conceptual rendering was not included in the original record transmitted to this Court.

Footing—See Detail." DER considers the permit requested by Sunrise for this "structure" to be a form of building permit, in the same sense in which permits required for signs or fences are considered to be building permits.

Permit No. 9414–89–CG was issued December 20, 1989. The work description is "grading/site work/landscaping." On the day of the issuance of the permit, a footing was poured. The cement was brought from a truck at Hanover Drive by front-end loader through the site to the footing excavation.[3] The workers covered the freshly poured cement with plastic and straw, and left the site.

Two days later Sunrise installed the snow fencing also called for by the Planning Board's condition of site approval. On December 26, Sunrise's engineer certified the column footing to DER.

Meanwhile, the County Council of Prince George's County was considering a general rezoning, called a Sectional Map Amendment (SMA), for an area of the County that included Greenbelt. Over the preceding two years there had been discussions between municipal officials of Green-

---

**3.** The evidence is conflicting as to the size of the footing that actually was poured. The detail on the column footing plan reflects the profile of a three-tiered footing, excavated to a depth of three feet from elevation 131.30 to elevation 128.30. The base tier profile, resting on earth capable of bearing 2,000 psf, is shown as 6′ by 1′, the second tier profile 4′ by 1′, and the top tier profile 2′ by 1′. The detail also reflects steel rods, six inches on center, both ways, in the bottom tier, three inches above the earth. Also, the detail for the column footing on the drawing had called for a 10″ by 10″ by 1″ steel plate with three-quarter inch anchor bolts at the top of the footing. There is no direct evidence that this plate or these bolts were installed.

The permit that was issued describes the structure to be 1′ by 1′ by 1′.

In its opinion the Board referred to the footing as being 2′ by 2′, without referring to any depth.

Sunrise introduced photographs taken at the time and place of the actual pour. The photographs show an excavation in a cleared area in woods. There is a steel rod gridwork on the earth at the bottom of the excavation. There are no forms in the excavation. The photos depict a workman standing in the excavation. His feet are resting on the bottom of the excavated area and his knees are at original ground level.

belt and representatives of Sunrise concerning possible use of the site for business offices, but those discussions had been inconclusive. On February 27, 1990, the mayor of Greenbelt wrote to the County Council opposing continuation of R–10 zoning for the Sunrise property, opposing commercial office zoning for the property, and urging that it be reclassified to R–18C zoning (multifamily medium density residential—condominium). The mayor referred to "already unacceptable traffic congestion" in the neighborhood, to the less dense character of the adjacent residential properties, and to the "overabundance of multi-family housing units in Greenbelt" in relation to single family dwellings.

Also in February 1990 the grading permit was issued to Sunrise. There was evidence that trees were cut down on the site in April 1990. Photographs of the site, however, taken in October 1990 from numerous points of view, reflect that it was still wooded and that the felled trees had not been removed.

On March 28, 1990, the column footing and rough grading plan was revised to add two retaining walls. One wall, approximately forty feet in length, was to be located within thirty feet of the southern boundary of the site. A second wall, perhaps fifty-five feet in length, was to be placed very near the northern boundary of the property. Both locations are removed from the proposed location for the apartment building. The permit for constructing these walls was issued on May 1.

The Prince George's County Council, sitting as a District Council, adopted the SMA, CR–39, on May 1, 1990, at approximately 10:20 a.m. It reclassified or downzoned the Sunrise property to R–18C.

The next day Sunrise poured a footing for one of the retaining walls. On May 4, DER inspectors visited the property, observed the footing for a retaining wall, and issued an immediate stop work order. The order was based, in part, on Sunrise's failure to have an inspector

present when the footing pour was made. By its terms the stop work order continued until a certification was furnished by a registered structural engineer.

While DER inspectors were on the property during the first week in May, they looked for the column footing. They were unable to locate it by visual observation alone, but did locate it by use of the site plan.

After discussions with representatives of Sunrise, DER, on August 10, 1990, advised that its stop work order "will remain in effect until such time as there are approved permits issued for development of the property in accordance with the R–18C zone."

Sunrise thereupon petitioned the Board to set aside the stop work order. The hearing that resulted was relatively lengthy. A site plans examiner for DER testified that the installation of the column footing was out of the sequence of construction contemplated by the sediment control plan initially submitted by Sunrise for the grading permit. The proposed sequence called for a meeting with the sediment control officer, then an initial site inspection on day one, installation of the sediment control devices, such as fences and traps, from days two through fifteen, clearing of the property on days sixteen through thirty and then, from days thirty-one through sixty-four, site grading and building of the column footing. Under the permit as issued for the column footing, a standard sediment control plan, PG 372, was incorporated. That standard plan is available only for properties involving 15,000 square feet or less of clearing and involving cuts no deeper than three feet.

The engineer who supervises the engineering standards division of DER testified that the footing could, at a maximum, support a 63,000 pound load on a twenty-one foot column. He also testified that the normal sequence in the design of a building is from the roof down. The witness assumed that the purpose of building a single footing was to test its load-bearing capacity.

In its decision the Board refused to vacate the stop work order, allowing it to remain in effect until permits, consistent with the downzoning, were obtained. The Board reviewed the evidence in a written order which included among its findings the following:

"5. The footing was not visible from Hanover Drive. The footing was not visible to the Construction Standards Inspector who walked the property in May, 1990.

. . . .

"7. Case law cited indicated that the doctrine of vested right in Maryland requires that to have a vested right there must be a manifest commencement of some work or labor on the ground which everyone can readily see and recognize as the commencement of a building, and the work must have been begun with the intention and purpose then formed to continue the work until the completion of the building.

"8. Petitioner worked for several years to gain the necessary approvals and permits to start to build the proposed high rise apartment buildings and continued to work with the intention of completing the project. Petitioner met this part of the two-prong vested right test in Maryland.

"9. No permit has been issued for the construction of the apartment buildings themselves.

"10. The pouring of a footing for the column of a two-story portico building which was not read[il]y visible as the commencement of a building, does not constitute vested right for the construction of high rise apartment buildings. Therefore, petitioner did not meet this part of the two-prong vested right test in Maryland."

Sunrise and its general partner appealed to the circuit court, captioning their order of appeal and their petition for review in two ways, (1) "in the matter of" the decision in the particular Board case number and (2) as an action by Sunrise and its general partner against the Board. The county attorney answered on behalf of "Prince George's County."

The circuit court reversed the Board for error "in its interpretation of the law of vested rights." The issue, as framed by the court in its written opinion, was "whether a single column footing not visible from the main road on which it is located is sufficient to 'vest rights' in a particular zoning classification." In the circuit court's view, the Board had required that the column footing be visible from Hanover Road, whereas that court read the vested rights decisions to require that "work done be recognizable, on inspection by a reasonable member of the public, as the commencement of construction." Construction had commenced, in the circuit court's opinion, for the following reasons:

> "Here the column footing is a support for the portico of the main lobby which connects the two towers of the proposed apartment building, and the pouring of the footing for the column was followed by the pouring of footings for a retaining wall. It is only where the work done is a 'window dressing' without the underlying intent to continue the project ... or the work done is proximate to but not part of the project ... that it does not fulfill the requirement.

The Court of Special Appeals agreed with the circuit court's analysis. The intermediate appellate court considered that "the Board found '[t]he pouring of a footing for the column of a two-story portico building *which was not read[il]y visible* as the commencement of a building, does not constitute vested right for the construction of highrise apartment buildings.'" [Emphasis that of the Court of Special Appeals]. That court concluded, as a matter of law, that "the footing column was recognizable as the commencement of construction, upon inspection."

## I

The County, Sunrise, the Board, the Circuit Court for Prince George's County, and the Court of Special Appeals all state the applicable rule in the same general terms, but they disagree on how that rule applies under the facts of

this case. The legal argument has revolved around the meaning of the rule as articulated in *Pemberton v. Montgomery County*, 275 Md. 363, 340 A.2d 240 (1975), where we said:

"The standard for determining commencement of construction (the development of which originated with *Kelly v. Rosenstock*, 45 Md. 389 (1876)), utilized by this Court in both *People's Counsel [v. Public Serv. Comm'n*, 259 Md. 409, 270 A.2d 105 (1970)] and *Ross [v. Montgomery County*, 252 Md. 497, 250 A.2d 635 (1969)], was laconically expressed by Judge Horney for this Court, in *Rupp v. Earl H. Cline & Sons*, 230 Md. 573, 188 A.2d 146 (1963), as follows:

'before there can be the *commencement of a building* [or another project] ... there must be (i) a manifest commencement of some work or labor on the ground which every one can readily see and recognize as the commencement [of the undertaking] ... and (ii) the work done must have been begun with the intention and purpose then formed to continue the work until the completion of the building [or other endeavor].' *Id.* at 578 [188 A.2d 146]."

275 Md. at 369–70, 340 A.2d at 244.

Most recently Judge Davidson, for the Court, stated the rule for deciding when rights vested in *O'Donnell v. Bassler*, 289 Md. 501, 425 A.2d 1003 (1981), but she used phraseology other than that incorporated from *Rupp* in *Pemberton*. The *O'Donnell* formulation of the rule is that

"[g]enerally, in order to obtain a vested right in an existing zoning use that will be protected against a subsequent change in a zoning ordinance prohibiting that use, the owner must initially obtain a valid permit. Additionally, in reliance upon the valid permit, the owner must make a substantial beginning in construction and in committing the land to the permitted use before the change in the zoning ordinance has occurred. *Steuart Petroleum Co. v. Board of County Comm'rs of St. Mary's County*, 276 Md. 435, 442–44, 347 A.2d 854, 859–60 (1975), *County*

*Council for Montgomery County v. District Land Corp.,* 274 Md. 691, 707, 337 A.2d 712, 721 (1975)." 289 Md. at 508, 425 A.2d at 1007.

Comparison of the two articulations of the same rule demonstrates that Sunrise's argument, accepted by the courts below, is largely one of semantics. The play on words arises from the Board's use of "read[il]y visible" in its finding No. 10 in lieu of the *Rupp* phraseology, "readily see and recognize." It is nevertheless clear that the Board was applying the *Rupp* test.

In ¶ 13 of the portion of the Board's opinion in which it reviewed the evidence and arguments of the parties, the Board stated the County's contention, as follows:

"Maryland Law has a two-prong test, namely:

"a. a manifest commencement of labor on the ground which everyone can readily see and recognize as the commencement of a building

"b. the work must have been begun with the intention and purpose then formed to continue the work until the completion of the building."

In the findings and conclusion section of the opinion, the Board, in ¶ 7, quoted above, restates in essence the *Rupp* rule, once again using the clause, "which everyone can readily see and recognize as the commencement of a building." In ¶ 8, the Board held that Sunrise met the intention prong of the *Rupp* test. Paragraph 9 then made the obvious point that no permit had been issued for construction of the apartment building. The only building permit relied upon for work done at the site in advance of the downzoning was for the column footing. Applying the *Rupp* test, the Board held in ¶ 10 that that footing "was not readily visible [*i.e.,* seen and recognized] as the commencement of a building" and the footing "does not constitute [a] vested right for the construction of high rise apartment buildings." Contrary to the emphasis supplied by the Court of Special Appeals on whether the footing was " 'read[il]y

visible,' " the emphasis should be on the words, "as the commencement of a building."

The Board's ¶ 10 holding, restated in the language used in *O'Donnell*, is that Sunrise had not made "a substantial beginning in construction and in committing the land to the permitted use before the change in the zoning ordinance ha[d] occurred." 289 Md. at 508, 425 A.2d at 1007.

Turning from semantics to the merits of this controversy, the question is whether the Board acted arbitrarily, capriciously or without substantial evidence in concluding that the footing in the middle of this 9.9591 acre site was not readily visible or recognizable on May 1, 1990, as the commencement of a highrise apartment building. The footing's dimensions, as reflected by the Board, result in an area of four square feet. A four square foot footing occupies 9/1,000,000 of the R–10 zone, considered in two dimensions. The footing occupies none of the air space of the R–10 zone, if it is considered in three dimensions. The Board did not err in declining to conclude that this swatch of cement would alert persons who came on the property that construction of a building had begun under the R–10 use.

Sunrise relies on evidence concerning two separate inspections of the site made in May and June of 1990, the earlier by two DER employees and the later by a DER employee and a City of Greenbelt employee. By using the site plan which showed the location of the column footing, and by estimating where that point was on the ground in relation to one or more boundaries or other landmarks, the inspectors were able to locate and uncover the footing. It is a fact that the footing was physically present on May 1, 1990. It is a fact that the grading plan identified the footing to be for a column, located at the corner of some kind of extension (later described in the testimony as a portico), projecting from the core between the wings of the building outlined on the plan. From these facts Sunrise and the courts below conclude that, as a matter of law, "everyone can readily see and recognize [the footing] as the

commencement" of the undertaking. *Pemberton,* 275 Md. at 370, 340 A.2d at 244 (quoting *Rupp,* 230 Md. at 578, 188 A.2d at 149). Thus, we can restate the issue in this case to be: "Who is the beholder?" Sunrise's argument, in essence, is that the beholder is a reasonably diligent building inspector, armed with filed and approved plans. That is not the Maryland law of vested rights.

The Maryland law of vested rights is formed by the confluence of at least three streams of cases. As an original proposition, the cases might be analyzed as dealing with distinct problems, but cross citation by this Court over the years has merged them into one body of authority. The earliest of the lines of cases involved priority between a mechanic's lien claimant and a mortgagee. Under the form of mechanic's lien statute in effect prior to *Barry Properties, Inc. v. Fick Bros. Roofing Co.,* 277 Md. 15, 353 A.2d 222 (1976) and *Caplan Bros. v. Village of Cross Keys, Inc.,* 277 Md. 41, 353 A.2d 237 (1976), a mechanic's lien attached upon the "commencement of the ... building." Md.Code (1957), Art. 63, § 15.

In *Brooks v. Lester,* 36 Md. 65 (1872), a case of disputed priority, this Court held that laying off a building area on the ground by driving in pegs was insufficient for a mechanic's lien to attach. *Id.* at 70. *Brooks* said that "commencement of the building" meant "some work and labor on the ground, the effects of which are apparent, easily seen by everybody, such as beginning to dig the foundation, or work of like description, which everyone can readily see and recognize as the commencement of a building." *Id.*

*Kelly v. Rosenstock,* 45 Md. 389 (1876), another mechanic's lien priority case, involved the driving in of stakes to mark off lots, and, at one corner, scraping away the dirt of a slope down to a level. The work was performed prior to July 13, and occupied only part of a day. A mortgage executed on August 6 was held to have priority. The Court considered the probability that, in the interval, the digging would have left no trace. "[I]f a party had examined these lots on the latter day, for the express purpose of seeing

whether he could safely take a mortgage upon them, he would have seen nothing which he would readily have recognized as the commencement of a building." *Id.* at 393.

*Rupp v. Earl H. Cline & Sons, Inc.,* 230 Md. 573, 578, 188 A.2d 146, 149 (1962), drawing on the earlier cases, stated the two-prong rule, as did *Frank J. Klein & Sons, Inc. v. Laudeman,* 270 Md. 152, 157, 311 A.2d 780, 783 (1973). *Rupp* held that building had not commenced despite lowering the elevation of a site by four to six feet in some places, to the approximate grade needed for the construction of apartments. 230 Md. at 579, 188 A.2d at 150.

*Klein,* on the other hand, found that the building of a nursing home had been commenced on the critical day. "[A]n inspection of the site would have revealed that grading had been accomplished, th[at] concrete with reinforcement rods had been poured for footings, and vanities built off the project had been stored on the site." 270 Md. at 157–58, 311 A.2d at 783.

Another stream of cases consists of those in which the statute that confers the right or privilege in issue contains a time limit within which construction must begin. *Pemberton,* 275 Md. 363, 340 A.2d 240, on which Sunrise principally relies, falls within this class of problem.[4] *Pemberton* is factually distinguishable from the instant matter.

In *Pemberton* the issue was whether a special exception had been lost through inactivity. The landowner had obtained a special exception for a gasoline station. It was valid for twelve months during which time a " 'building permit for such erection ... must be obtained and the erection ... started.' " *Id.* at 366, 340 A.2d at 242 (quoting Montgomery County Code § 111–32(c) (1955)). One day

---

4. This class of cases also includes *People's Counsel v. Public Serv. Comm'n,* 259 Md. 409, 270 A.2d 105 (1970); *Alpha Enters., Inc. v. Cameron,* 253 Md. 49, 251 A.2d 582 (1969); *Ross v. Montgomery County,* 252 Md. 497, 250 A.2d 635 (1969); *see also Steuart Petroleum Co. v. Board of County Comm'rs of St. Mary's County,* 276 Md. 435, 347 A.2d 854 (1975).

before the end of the twelve month period, the owner obtained a building permit for the construction of a retaining wall, dug a trench, installed horizontal steel rods and poured five to six yards of concrete for footings for the retaining wall. The Montgomery County Board of Appeals concluded, over the protest of a neighbor, that the gasoline station could operate under the special exception. We upheld the board of appeals' determination. As noted above, *Pemberton* incorporated the *Rupp* test, the construction prong of which refers to the theoretical beholder as " 'every one.' " 275 Md. at 370, 340 A.2d at 244. In *Pemberton* the footing for the retaining wall was at the low end of a slope on the property. Construction of the retaining wall was an essential first step, preliminary to filling and leveling the site so that the underground storage tanks for a gasoline station could be installed. On that basis there was substantial evidence to support the Board's conclusion that " 'every one' " could readily recognize the work as the commencement of a gasoline service station. *See id.* at 372, 340 A.2d at 245.

The third stream of cases involves the issue of vested rights, per se. By a per se vested rights case we mean one invoking "[t]hat doctrine, which has a constitutional foundation [and which] rests upon the legal theory that when a property owner obtains a lawful building permit, commences to build in good faith, and completes substantial construction on the property, his right to complete and use that structure cannot be affected by any subsequent change of the applicable building or zoning regulations." *Prince George's County v. Equitable Trust Co.*, 44 Md.App. 272, 278, 408 A.2d 737, 741 (1979).

The first case in this Court squarely raising that doctrine is *Richmond Corp. v. Board of County Comm'rs for Prince George's County*, 254 Md. 244, 255 A.2d 398 (1969). There the developer owned commercially zoned land abutting residentially zoned land. The developer had expended large sums of money in acquisition of the property and in preparing plans, leases and specifications for a shopping

center on the commercially zoned tract that would utilize the residentially zoned tract for parking. Before there was any construction on the ground, the zoning ordinance was amended to require a special exception for parking on residentially zoned property as auxiliary to a commercial use. In rejecting a contention that the developer had vested rights under the earlier zoning, we borrowed from the law of nonconforming uses the concept of public knowledge in the neighborhood of the use, saying:

> "In Maryland it is established that in order to obtain a 'vested right' in the existing zoning use which will be constitutionally protected against a subsequent change in the zoning ordinance prohibiting or limiting that use, the owner must (1) obtain a permit or occupancy certificate where required by the applicable ordinance and (2) must proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being devoted to that use. *See Feldstein v. LaVale Zoning Board,* 246 Md. 204, 210, 227 A.2d 731, 734 (1967), indicating that [*Mayor & City Council v.*] *Shapiro* [, 187 Md. 623, 51 A.2d 273 (1947)] as well as *Chayt v. Board of Zoning Appeals,* 177 Md. 426, 9 A.2d 747 (1939), established as one of the tests for determining the existence of a nonconforming use 'is whether such use was known in the neighborhood.'"

254 Md. at 255–56, 255 A.2d at 404.

In *Rockville Fuel & Feed Co. v. Gaithersburg,* 266 Md. 117, 291 A.2d 672 (1972), we said that "[s]uch a 'vested right' could only result when a lawful permit was obtained and the owner, in good faith, has proceeded with such construction under it as will advise the public that the owner has made a substantial beginning to construct the building and commit the use of the land to the permission granted." *Id.* at 127, 291 A.2d at 677; *see also County Council for Montgomery County v. District Land Corp.,* 274 Md. 691, 337 A.2d 712 (1975).

■ It is clear from all of the foregoing that a theoretical, reasonably diligent building inspector is not the test of the beholder. That test is far too narrow to satisfy the concept of the "public" in *Rockville Fuel*, the "neighborhood" in *Richmond Corp.*, and "every one" in *Rupp*. Part of the rationale for the test of whether rights have vested is public recognition that the law is being observed or enforced. If the public could have seen that construction had started before the zoning change, the public can appreciate that the new law is not being violated. But, if construction, recognizable by the public as such, had not commenced before the change of law, later construction for a use that is no longer permitted is subject to the current zoning, and is in violation of it, so that the public will expect the new law to be enforced. Paraphrasing a portion of the opinion of the circuit court in this case, we hold that, in order for rights to be vested before a change in the law, the work done must be recognizable, on inspection of the property by a reasonable member of the public, as the commencement of construction of a building for a use permitted under the then current zoning.

■ Here, the pouring of a single 2′ × 2′ footing in the center of a nearly ten acre wooded site is the only construction to which Sunrise can point for its vested rights argument. The evidence is that building inspectors, who knew that the footing had been poured and who were on the property looking for the footing, could not see where it was. They were able to locate it only by use of the site plan. A member of the public is not required to be equipped with the column footing version of the site plan to observe if this construction had started. From the standpoint of a member of the general public who is either viewing the property from its boundaries or is consensually on the property, the footing is not so clearly the commencement of construction as to render the Board's finding to the contrary arbitrary, capricious or without substantial evidence on the entire record.

## II

Sunrise has moved to dismiss the "appeal," *i.e.*, certiorari review, by invoking the *McKinney* doctrine (*Board of Zoning Appeals v. McKinney*, 174 Md. 551, 199 A. 540 (1938)). Sunrise argues that its adversary in this judicial review of administrative action is the Board and that the Board has no interest in the matter, other than to decide cases that come before it.[5]

█ Sunrise's argument is devoid of merit, although not of chutzpah. When Sunrise petitioned the Circuit Court for Prince George's County for judicial review of the Board's action, Sunrise captioned its papers to denote the Board as its adversary, and that caption appears on the docket and on subsequent papers generated by both sides of the controversy. The party that appeared adversely to Sunrise, however, through the filing of an answer to Sunrise's petition, was Prince George's County, Maryland. The Court of Special Appeals so held when Sunrise raised this issue before that court, and Sunrise did not conditionally cross-petition for certiorari on this issue decided adversely to it in the intermediate appellate court.

Assuming that the issue raised here on motion by Sunrise is properly before us, we agree with the Court of Special Appeals and hold that the adverse party is Prince George's County, Maryland. Thus, *McKinney* is inapplicable.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND REMANDING THIS MATTER TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR THE ENTRY OF A JUDGMENT SUSTAINING THE ORDER OF THE BOARD OF ADMINISTRA-

---

5. In *Consumer Protection Div. v. Consumer Publishing Co.*, 304 Md. 731, 501 A.2d 48 (1985), we had occasion to review the *McKinney* doctrine and to place it in perspective in Maryland administrative law.

TIVE APPEALS OF PRINCE GEORGE'S COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY SUNRISE DEVELOPMENT LIMITED PARTNERSHIP ET AL., THE RESPONDENTS.

ROBERT M. BELL, J., concurs only in the judgment.